239 P.3d 1

**HAWAII GOVERNMENT EMPLOYEES ASSOCIATION, AFSCME LOCAL 152, AFL–CIO, Plaintiff–Appellee,**

and

Hawaii State Teachers Association and United Public Workers, AFSCME, Local 646, ALF–CIO, Intervenors–Appellees,

v.

Linda LINGLE, as Governor of the State of Hawai'i; and Does 1–10, Defendant–Appellant.

No. 29972.

Supreme Court of Hawai'i.

Sept. 8, 2010.

Mark J. Bennett, Attorney General, (Lisa M. Ginoza, First Deputy Attorney General and Deirdre Marie–Iha, Deputy Solicitor General with him on the briefs) for Defendant–Appellant Linda Lingle, as Governor of the State of Hawaiʻi.

Charles A. Price (James E.T. Koshiba with him on the brief) of Koshiba Agena & Kubota, Honolulu, for Plaintiff–Appellee Hawaii Government Employees Association, AFSCME Local 152, AFL–CIO.

Herbert R. Takahashi (Rebecca L. Covert, Danny J. Vasconcellos and Rebecca L. Covert with him on the brief) of Takahashi Vasconcellos & Covert, Honolulu, and Scott A. Kronland of Altshuler Berzon LLP, pro hac vice, for Intervenor–Appellee Hawaii State Teachers Association and United Public Workers, AFSCME, Local 646, AFL–CIO.

NAKAYAMA, Acting C.J., DUFFY and RECKTENWALD, JJ., Circuit Judge AHN in place of MOON, C.J., Recused, and ACOBA, J., Dissenting.

1. The Honorable Karl K. Sakamoto presided.

2. HRS § 89–9(d) provides:
 Excluded from the subjects of negotiations are matters of classification, reclassification, benefits of but not contributions to the Hawaii employer-union health benefits trust fund or a voluntary employees' beneficiary association trust; recruitment; examination; initial pricing; and retirement benefits except as provided in section 88–8(h). *The employer and the exclusive representative shall not agree to any proposal* that would be inconsistent with the merit principle or the principle of equal pay for equal work pursuant to section 76–1 or *that would interfere with the rights and obligations of a public employer to:*
 (1) Direct employees;
 (2) Determine qualifications, standards for work, and the nature and contents of examinations;
 (3) Hire, promote, transfer, assign, and retain employees in positions;
 (4) Suspend, demote, discharge, or take other disciplinary action against employees for proper cause;
 (5) *Relieve an employee from duties because of lack of work or other legitimate reason;*
 (6) Maintain efficiency and productivity, including maximizing the use of advanced technology, in government operations;

Opinion of the Court by NAKAYAMA, J.

Defendant–Appellant, Linda Lingle ("Lingle"), as Governor of the State of Hawaiʻi, appeals from the Circuit Court of the First Circuit's [1] ("circuit court's") July 28, 2009 final judgment and findings of fact, conclusions of law, and order in favor of Plaintiff–Appellee, Hawaii Government Employees Association, AFSCME Local 152, AFL–CIO ("HGEA"). On appeal, Lingle presents the following points of error: (1) "the circuit court erred when it acted without jurisdiction and ruled on whether the furlough plan complied with Hawaiʻi Revised Statutes (HRS) § 89–9(d) [ (Supp.2008) [2]] and the unilateral change doctrine"; (2) "[t]he circuit court erred when it concluded that [Lingle's] furlough plan was not a valid exercise of her management rights under HRS § 89–9(d) and violated the unilateral change doctrine"; (3) "[t]he circuit court erred when it incorrectly ruled, as a matter of law, that [Lingle's] furlough plan violated the constitutional right to bargain collectively in the public sector under [a]rticle XIII § 2 of the Hawaii constitution"; [3] and (4) "[t]he circuit court erred in applying the test for injunctive re-

 (7) *Determine methods, means, and personnel by which the employer's operations are to be conducted; and*
 (8) *Take such actions as may be necessary to carry out the missions of the employer in cases of emergencies.*
 This subsection shall not be used to invalidate provisions of collective bargaining agreements in effect on and after June 30, 2007, and shall not preclude negotiations over the procedures and criteria on promotions, transfers, assignments, demotions, layoffs, suspensions, terminations, discharges, or other disciplinary actions as a permissive subject of bargaining during collective bargaining negotiations or negotiations over a memorandum of agreement, memorandum of understanding, or other supplemental agreement.
 Violations of the procedures and criteria so negotiated may be subject to the grievance procedure in the collective bargaining agreement.
 (Emphases added.)

3. Article XIII, section 2 of the Hawaiʻi constitution provides: "Persons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law."

lief" because "HGEA demonstrated no irreparable harm, and the public interest did not support granting the injunction, and the circuit court misread the . . . law." Based upon the following analysis, we vacate the circuit court's July 28, 2009 final judgment and findings of fact, conclusions of law and order, and remand this case for further proceedings consistent with this opinion. More specifically, we hold that the Hawai'i Labor Relations Board ("HLRB") had "exclusive original jurisdiction" over the statutory issues raised by HGEA, and that the circuit court should have deferred ruling on the constitutional issues until after the HLRB had the opportunity to resolve the statutory questions.

## I. BACKGROUND

### A. Executive Order 09–02

On June 24, 2009, Lingle issued executive order 09–02. Therein it was observed that "the widespread impact of the global financial crisis and constantly decreasing revenue projections by the [state] Council on Revenues . . . forced the State of Hawaii to make drastic and unprecedented revenue and expenditure adjustments to close a budget shortfall of approximately two billion dollars ($2,000,000,000) through the fiscal biennium 2009–2011[.]" (Brackets and ellipsis added.) It observed further that, "based on the May 28, 2009 projections by the [state] Council on Revenue, the State of Hawaii is . . . facing an additional deficit of seven hundred thirty million dollars ($730,000,000) through the fiscal biennium 2009–2011, resulting in an immediate fiscal emergency of unparalleled magnitude[.]"

In light of the current revenue estimates, executive order 09–02 ordered the furlough[4] of certain state executive branch employees for a total of seventy-two work days over the fiscal biennium 2009–2011,[5] which was to become effective on July 1, 2009, and subject to certain terms and conditions. Among these terms and conditions was the requirement that the affected state executive branch employees' pay would be "automatically adjusted" by reducing the affected employee's pay between 13.8% and 15.8% each pay period to account for the furlough days.

Although executive order 09–02 was issued on June 24, 2009, on June 1, 2009, Lingle publicly announced her plan to, among other things, furlough certain state executive branch employees for "3 days/24 hours each month, from July 1, 2009 to June 30, 2011, thereby unilaterally reducing employees' hours and cutting employees' wages approximately 13.8%."

### B. Circuit Court Proceedings

After Lingle's June 1, 2009 announcement, on June 16, 2009, HGEA filed a complaint in the circuit court that sought, among other things, a declaratory judgment that Lingle "cannot unilaterally impose the furloughs," and a preliminary and permanent injunction enjoining Lingle from "unilaterally imposing" the same. HGEA based its request for relief on article XIII, section 2 of the Hawai'i constitution and HRS Chapter 89.

In a first amended complaint filed on June 22, 2009, HGEA averred that Lingle "intends to unilaterally implement new procedures regarding layoffs after June 20, 2009 and impose mass state employee[ ] layoffs" "if her furlough plan is blocked by the courts." As such, HGEA also sought a declaratory judgment that Lingle cannot "unilaterally impose new layoff procedures," and a preliminary and permanent injunction enjoining Lingle from "unilaterally imposing" the same.

On June 23, 2009, HGEA filed a motion for preliminary injunction. Briefly summarized, in its memorandum in support of its motion, HGEA asserted that collective bargaining is a constitutionally protected right and statutorily mandated. HGEA also asserted that furloughs are a "mandatory and core subject of collective bargaining" pursuant to HRS Chapter 89 and common law, and the com-

---

4. Executive order number 09–02 defined a "furlough" as "the placement of an employee temporarily and involuntarily in a non-pay and non-duty status by the Employer because of lack of work or funds, or other non-disciplinary reasons."

5. Executive order number 09–02 required that thirty-six furlough days were to be taken during each of fiscal years 2009–2010 and 2010–2011.

mon law "unilateral change" doctrine prevents Lingle from unilaterally imposing furloughs during the pendency of an arbitration process between it and the public employers.[6]

On June 29, 2009, Lingle filed her opposition to HGEA's motion for preliminary injunction. Among the arguments made, Lingle asserted that HGEA's assertions are "predominately prohibited practices complaints that fall under HLRB's 'exclusive primary jurisdiction.'" Lingle also asserted that (1) the "management rights" in HRS § 89–9(d) gives her authority to furlough "unionized workers" and these "rights" are not subject to collective bargaining, (2) the furlough order is consistent with article XIII, section 2 of the Hawai'i constitution, (3) the furlough order does not violate the unilateral change doctrine, (4) HGEA's complaints about layoff procedures are premature and within HLRB's jurisdiction even when ripe, (5) HGEA has not shown that they will suffer irreparable damage if the preliminary injunction is denied, and (6) the public interest requires denying the injunction.

On July 28, 2009, the circuit court filed its findings of fact, conclusions of law, and order that, among other things, granted in part HGEA's motion for preliminary injunction.[7] Therein, the circuit court made the following pertinent conclusions: (1) pursuant to *United Pub. Workers, AFSCME, Local 646, AFL–CIO v. Yogi*, 101 Hawai'i 46, 62 P.3d 189 (2002) and *Malahoff v. Saito*, 111 Hawai'i 168, 140 P.3d 401 (2006), Lingle's unilateral decision to furlough certain unionized state executive branch employees "infringed on core subjects of collective bargaining [ (namely, wages) ], in violation of article XIII, section 2 of the Hawaii constitution[,]"; (2) pursuant to *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), "certain terms and conditions of an expired agree-ment continue in effect by operation of law" and, inasmuch as the furloughs "change wages," the furloughs "cannot be imposed by unilateral action[,]"; (3) essentially, inasmuch as "the courts retain jurisdiction to consider constitutional claims[,]" Lingle's assertion that the HLRB has exclusive jurisdiction over this matter is unpersuasive; (4) *United Pub. Workers, AFSCME, Local 646, AFL–CIO v. Hanneman*, 106 Hawai'i 359, 105 P.3d 236 (2005) is inapposite; (5) Lingle's reliance on the "managerial rights" provisions in HRS § 89–9(d) "to justify unilateral imposition of the furlough program cannot be accepted because it would allow lawmakers absolute discretion to define the scope of collective bargaining, thereby defeating the intent of [a]rticle XIII, [s]ection 2[,]"; and (6) the issues of layoff procedures and criteria are not ripe for consideration at this time.

A final judgment was filed on June 28, 2009. On July 31, 2009, Lingle timely filed a notice of appeal.

On September 1, 2009, Lingle filed an application to transfer her appeal from the Intermediate Court of Appeals to this court. On September 22, 2009, this court granted Lingle's application for transfer.

## II. STANDARDS OF REVIEW

### A. Subject Matter Jurisdiction

■ "Whether a court possesses subject matter jurisdiction is a question of law reviewable *de novo*." *Hawaii Mgmt. Alliance Ass'n v. Ins. Comm'r*, 106 Hawai'i 21, 27, 100 P.3d 952, 957 (2004) (citation and internal quotation marks omitted).

### B. Statutory Interpretation

■ "Questions of statutory interpretation are questions of law reviewable *de*

---

6. We note that the circuit court made the following findings that appear to be undisputed between the parties:

> 3. HGEA, as the exclusive collective bargaining representative for collective bargaining units 2, 3, 4, 9, and 13, entered into collective bargaining agreements with the public employers, including the State of Hawaii, for the period July 1, 2007 to June 30, 2009.
>
> 4. By Memorandum of Agreement, dated February 20, 2009, HGEA and the public em-

ployers, including the State of Hawaii, agreed to an impasse, negotiation, mediation, and interest arbitration procedure for reaching the successor collective bargaining agreements, effective July 1, 2009.

7. The circuit court, "in the interests of judicial efficiency," also entered a permanent injunction in favor of HGEA and against Lingle.

*novo." Gump v. Wal–Mart Stores, Inc.*, 93 Hawai'i 417, 420, 5 P.3d 407, 410 (2000). In our review of questions of statutory interpretation, this court follows certain well-established principles, as follows:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Awakuni v. Awana*, 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007) (citation omitted).

## C. Constitutional Law

■ "[T]his court reviews questions of constitutional law *de novo*, under the right/wrong standard." *Jou v. Dai–Tokyo Royal State Ins. Co.*, 116 Hawai'i 159, 164–65, 172 P.3d 471, 476–77 (2007) (quoting *Onaka v. Onaka*, 112 Hawai'i 374, 378, 146 P.3d 89, 93 (2006)) (internal quotation marks omitted).

## III. DISCUSSION

■ Lingle asserts that HRS § 89–14 (1993) gives the HLRB original jurisdiction over the statutory claims in this case, and the circuit court acted beyond its jurisdiction by ruling on questions intended exclusively for HLRB. HGEA asserts that the circuit court properly exercised jurisdiction in this case because HLRB's jurisdiction is limited to the extent that the courts, and not the HLRB, "can (1) decide constitutional questions and (2) grant injunctive relief." [8]

HRS § 89–14 provides, in its entirety:

> Any controversy concerning prohibited practices may be submitted to the board in the same manner and with the same effect as provided in section 377–9; provided that the board shall have exclusive original jurisdiction over such a controversy except that nothing herein shall preclude (1) the institution of appropriate proceedings in circuit court pursuant to section 89–12(e) or (2) the judicial review of decisions or orders of the board in prohibited practice controversies in accordance with section 377–9 and chapter 91. All references in section 377–9 to "labor organization" shall include employee organization.

Contrary to HGEA's assertions, pursuant to HRS § 89–14, original jurisdiction in this case properly resided with the HLRB and not the circuit court. In 1981, the Intermediate Court of Appeals ("ICA") filed a published opinion in *Winslow v. State*, 2 Haw.App. 50, 625 P.2d 1046 (1981). In *Winslow*, two of the issues addressed by the ICA were (1) "[w]hether grievance procedures established in the labor agreement to resolve disputes between the public employer and union members apply to an action against the union as well[,]" and (2) "[w]hether [the Hawaii Public Employment Relations Board ('HPERB')[9]]

---

**8.** We agree with the dissent that "the litigation between HGEA and [Lingle] is settled and the furlough controversy is moot." Dissent at 214, 239 P.3d at 18. However, the instant case satisfies the public interest exception to the mootness doctrine. "[W]hen the question involved affects the public interest and an authoritative determination is desirable for the guidance of public officials, a case will not be considered moot." *Doe v. Doe*, 116 Hawai'i 323, 327, 172 P.3d 1067, 1071 (2007) (quoting *Slupecki v. Admin. Dir. of the Courts*, 110 Hawai'i 407, 409 n. 4, 133 P.3d 1199, 1201 n. 4 (2006)) (internal quotation marks omitted). Under this exception to the mootness

doctrine, "we look to '(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question.'" *Id.* (citation omitted). We also agree with the dissent's analysis of these three factors, *see* dissent at 215–16 n. 8, 239 P.3d at 19–20 n. 8, inasmuch as we conclude that the public interest exception to the mootness doctrine is satisfied by these reasons.

**9.** In 1985, the HPERB became the HLRB. *See* 1985 Haw. Sess. Laws Act 251, § 4 at 476.

has exclusive jurisdiction to hear complaints of unfair labor practices brought against a union by a union member[.]" *Id.* at 51–52, 625 P.2d at 1048–49.

With regard to the first issue, the ICA ultimately held that the "appellant could not be required to exhaust contractual remedies in an action against the union where no such remedies actually exist" because, "in the enactment of the contract's grievance procedures, it was not contemplated that the employee would utilize the procedures in a grievance against the union[ ] itself[.]" *Id.* at 56, 625 P.2d at 1051.

However, with regard to the second issue, the ICA pointed out that an employee in this situation "is not left remediless," and, in Hawai'i, "such an employee apparently has two options." *Id.* The first option recognized by the ICA in its opinion was the filing of a complaint in the HPERB. *See id.* However, the ICA stated that the HPERB's "jurisdiction in these matters ... is not exclusive." *Id.* (ellipsis added). According to the ICA: "In the face of the allegations that the union is guilty of prohibited practices,[ ] the statutes[[10]] permit such action to be brought before the [HPERB] or in a court of competent jurisdiction." [11] *Id.* (footnote added and omitted); *see Santos v. State, Dept. of Transp., Kauai Div.,* 64 Haw. 648, 655 n. 12, 646 P.2d 962, 967 n. 12 (1982) (recognizing that *Winslow* held in part that "under HRS § 89–14 prohibited practices whether committed by the employer, employee, or employee organization can be taken before HPERB or in a court of competent jurisdiction"). As such, the second option recognized by the ICA was the filing of a complaint "in a court of competent jurisdiction."

*See Winslow,* 2 Haw.App. at 56, 625 P.2d at 1051.

At the time *Winslow* was decided, HRS § 89–14 provided: "Any controversy concerning prohibited practices may be submitted to the board in the same manner and with the same effect as provided in section 377–9. All references in section 377–9 to 'board' shall include the Hawaii public employment relations board and 'labor organization' shall include employee organization." 2 Haw.App. at 56–57, 625 P.2d at 1051 (quoting HRS § 89–14).[12]

However, in 1982, Hawaii's legislature amended HRS § 89–14 to "legislatively ... overrule[ ]" *Winslow* because it disagreed with the ICA's interpretation of HRS § 89–14 and HRS § 377–9. A standing committee report was issued by the Committee on Public Employment and Government Operations that stated, in pertinent part, as follows:

> The purpose of this bill is to make the jurisdiction of the [HPERB] in controversies relating to prohibited practices exclusive except as otherwise provided in Chapter 89, [HRS].
>
> . . . .
>
> Recently, the [ICA], in [*Winslow* ], construed sections 89–14 and 377–9, HRS, and concluded that the jurisdiction of the [HPERB] over controversies concerning prohibited (unfair labor) practices in the public sector is *not* exclusive, and that a prohibited practice complaint or action may be brought either before HPERB *or* in circuit court. In other words, the [ICA] concluded that under these two statutory sections, HPERB and the circuit courts have *concurrent* jurisdiction over prohibited practice complaints in the public sector.

**10.** Apparently, the ICA was referring to the versions of HRS § 89–14 and HRS § 377–9 in effect at the time, *see Winslow,* 2 Haw.App. at 56–57, 625 P.2d at 1051–52, and are quoted *infra.*

**11.** In other words, the ICA concluded:

> It seems clear ... that under HRS § 89–14 prohibited practices whether committed by the employer, employee, or employee organization are to be treated in the same manner as unfair labor practices under HRS § 377–9. *From a policy standpoint, it may have been preferable for appellant to pursue her relief from HPERB; however, nothing in the statute precludes this*

*action from being brought in circuit court as well.*

*Winslow,* 2 Haw.App. at 57, 625 P.2d at 1052 (ellipsis, emphasis, and brackets added).

**12.** We note that, at the time *Winslow* was decided, HRS § 377–9(a) provided: "Any controversy concerning unfair labor practices may be submitted to the employment relations board in the manner and with the effect provided in this chapter, but nothing herein shall prevent the pursuit of relief in courts of competent jurisdiction." 2 Haw.App. at 57, 625 P.2d at 1052 (quoting HRS § 377–9(a)).

By making the jurisdiction of HPERB *exclusive* in controversies concerning prohibited practices, this bill legislatively rectifies or overrules the judicial conclusion or statutory construction enunciated in [*Winslow*].

H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943 (emphases in original, brackets added).

A separate standing committee report was issued by the Committee on Judiciary, which stated:

The purpose of this bill is to clarify that the [HPERB], rather than the courts, has primary jurisdiction over prohibited practice complaints filed under Chapter 89, Hawaii Revised Statutes.

A recent Hawaii Court of Appeals decision interprets Section 89–14 and 377–9, Hawaii Revised Statutes, to give HPERB and the circuit courts concurrent jurisdiction over prohibited practice complaints. This bill will make it clear that HPERB has exclusive original jurisdiction over prohibited practice complaints. Appeals from HPERB will continue to be filed in Circuit Court.

H. Stand. Comm. Rep. No. 589–82, in 1982 House Journal, at 1164 (brackets added).

As further explained by the Committee on Human Resources:

In 1970, the Legislature created the [HPERB] to administer the provisions of Chapter 89 in an effort to promote cooperative relations between the government and its employees and to protect the public by ensuring orderly government operations. Thus, the board was given jurisdiction of prohibited practice cases. Your Committee believes the original intent of this provision was to allow the board, who is the administrative agency with the expertise in public employment relations, to have primary jurisdiction of prohibited practice complaints. However, a recent Hawaii Court of Appeals decision interprets Section 89–14 and 377–9, Hawaii Revised Statutes, to give HPERB and the

circuit court concurrent jurisdiction over prohibited practice complaints.

This bill will make it clear that HPERB has exclusive original jurisdiction over prohibited practice complaints. Appeals from HPERB will continue to be filed in Circuit Court.

S. Stand. Comm. Rep. No. 597–82, in 1982 Senate Journal, at 1202 (brackets added).

As enacted, the pertinent portions of HRS § 89–14 were amended to read as it does today.[13] *See* 1982 Haw. Sess. Laws Act 27, § 1 at 38.

■ In light of the foregoing, the legislature clearly intended for the HLRB to have exclusive original jurisdiction over prohibited practice complaints, and the ICA's contrary interpretation in *Winslow* was incorrect. *See, e.g.,* H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943. As it applies to this case, what constitutes a "prohibited practice" is set forth in HRS § 89–13(a) (Supp.2003), as follows:

It shall be a prohibited practice for a public employer or its designated representative wilfully to:

. . . .

(5) Refuse to bargain collectively in good faith with the exclusive representative as required in section 89–9;

(6) Refuse to participate in good faith in the mediation and arbitration procedures set forth in section 89–11;

(7) Refuse or fail to comply with any provision of this chapter;

(8) Violate the terms of a collective bargaining agreement.

(Ellipsis added.)

Paragraphs 5 and 7 of HGEA's first amended complaint alleges:

5. The Governor cannot unilaterally impose furloughs and circumvent the collective bargaining process. Furloughs reduce employee hours and wages and affect terms and conditions of employment and, therefore, are a mandatory subject of collective bargaining negotiation protected by

---

13. We note that HRS § 89–14 was amended again in 1985 only to remove any language referring to the HPERB, inasmuch as the HPERB

became the HLRB in that year. *See* 1985 Haw. Sess. Laws Act 251, § 6 at 479–80.

Article XIII, Section 2 of the Hawaii State Constitution and as prescribed by HRS § 89–9(a). Any disputes over negotiable subjects, when properly presented, must be resolved in accordance with the impasse, mediation, and arbitration process prescribed by HRS § 89–11 and the Memorandum of Agreement, dated February 20, 2009, between HGEA and the Employer. The Governor does not have the implied right to unilaterally impose furloughs pursuant to HRS § 89–9(d).

. . . .

7. Alternatively, even if furloughs are not a mandatory subject of collective bargaining negotiation, and they are, the *procedures* for implementing furloughs are subject to negotiation under Article XIII, Section 2 of the Hawaii State Constitution and HRS Chapter 89 and are also, if properly presented, subject to the above-described arbitration process.

(Italics in original, ellipsis added.)

In light of these and other allegations, HGEA asserted in its first amended complaint, as follows:

### COUNT I

8. HGEA requests, and is entitled to receive, a declaratory judgment that the Governor cannot unilaterally impose the furloughs.

### COUNT II

9. HGEA requests, and is entitled to receive in order to avoid irreparable harm, a preliminary and permanent injunction from this court enjoining the Governor from unilaterally imposing the furloughs.

### COUNT III

. . . .

13. The Governor's unilateral action is a violation of the Hawaii Constitution, Article XIII, Section 2.

### COUNT IV

. . . .

15. Layoff procedures are subject to negotiation under Article XIII, Section 2 of the Hawaii State Constitution and HRS

Chapter 89 and are also, if properly presented, subject to the above-described arbitration process.

. . . .

17. HGEA requests, and is entitled to receive, a declaratory judgment that the Governor cannot unilaterally impose new layoff procedures.

18. HGEA also requests, and is entitled to receive in order to avoid irreparable harm, a preliminary and permanent injunction from this court enjoining the Governor from unilaterally imposing new layoff procedures.

(Ellipses added.)

 Viewing the assertions made by HGEA in its first amended complaint in light of HRS § 89–13(a), it appears that HGEA alleges that Lingle essentially engaged in a "prohibited practice" when she unilaterally imposed furloughs. *See* HRS § 89–13(a). For example, HRS § 89–13(a)(5) mandates that "[i]t shall be a prohibited practice for a public employer ... willfully to ... [r]efuse to bargain collectively in good faith with the exclusive representative as required in [HRS § ] 89–9[,]" while paragraph 5 of HGEA's complaint alleges that "[t]he Governor does not have the implied · right to unilaterally impose furloughs pursuant to HRS § 89–9(d)" thereby "circumvent[ing] the collective bargaining process" because "[f]urloughs reduce employee hours and wages and affect terms and conditions of employment and, therefore, are a mandatory subject of collective bargaining negotiation protected by Article XIII, Section 2 of the Hawaii State Constitution and as prescribed by HRS § 89–9(a)." (Brackets added.) Pertinent statutes clearly provide that the HLRB has jurisdiction to "[r]esolve controversies under [HRS chapter 89.]" HRS § 89–5(i)(3) (Supp.2005) (brackets added); *see id.* § 89–5(a) ("There is created a Hawaii labor relations board to ensure that collective bargaining is conducted in accordance with this chapter . . . ."); *id.* § 89–5(i)(4) ("In addition to the powers and functions provided in other sections of this chapter, the board shall ... conduct proceedings on complaints of prohibited practices by employers ... and take such actions with

respect thereto as it deems necessary and proper[.]"); *see also* HRS § 89–1(b)(3) (Supp.2005) ("The legislature declares that it is the public policy of the State to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government. These policies are best effectuated by ... [c]reating a labor relations board to administer the provisions of [HRS] chapters 89 and 377."). HRS § 89–14 provides that the HLRB "shall have exclusive original jurisdiction over" "[a]ny controversy concerning prohibited practices." Although HGEA's complaint does not expressly use the words "prohibited practice," a prohibited practice can be logically inferred therefrom because HGEA's complaint essentially alleges, among other things, that Lingle "[r]efuse[d] to bargain collectively in good faith with the exclusive representative as required in [HRS] section 89–9[,]", and HRS § 89–13(a)(5) mandates that it "*shall be a prohibited practice* for a public employer ... [to] wil[l]fully ... [r]efuse" to bargain collectively as such. (Emphasis added); *see Au v. Au,* 63 Haw. 210, 221, 626 P.2d 173, 181 (1981) ("Generally, pleadings should be construed liberally and not technically."); *see also* Hawai'i Rules of Civil Procedure (HRCP) Rule 8(a) (instructing that a "pleading which sets forth a claim for relief ... shall contain" among other

things "a short and plain statement of the claim showing that the pleader is entitled to relief"), 8(f) ("All pleadings shall be so construed as to do substantial justice.").[14] As such, the HLRB has exclusive original jurisdiction over the statutory claims raised in HGEA's complaint. *See* HRS § 89–14; HRS § 89–13(a); *see also, e.g.,* H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943.

Nonetheless, HGEA asserts that the HLRB's jurisdiction is limited to the extent that a court, and not the HLRB, has jurisdiction to decide constitutional questions because HRS § 89–14 states that "nothing herein shall preclude the judicial review of decisions or orders of the [HLRB] in accordance with [HRS] section 377–9." In support of its assertion, HGEA then points to the following portion of HRS § 377–9(a) (1993): "Any controversy concerning unfair labor practices may be submitted to the board in the manner and with the effect provided in this chapter, but nothing herein shall prevent the pursuit of relief in courts of competent jurisdiction."

However, HGEA overlooks that the language that it relies on in HRS § 89–14 refers to an appeal from, or "judicial review" of, a "decision[ ] or order[ ] of the [HLRB]." *See* HRS § 89–14. Indeed, HRS § 377–9(f) to (h) provides instruction in this regard.[15] The

---

**14.** Moreover, we point out that Intervenors–Appellees, Hawaii State Teachers Association and United Public Workers, AFSCME, Local 646, AFL–CIO (collectively, "Intervenors") "acknowledge[d]" in their answering brief "that the HLRB might have concluded that [Lingle's] Executive Order was a 'prohibited practice' because it violated the *statutory* duty to bargain in HRS Chapter 89." (Emphasis in original.)

**15.** HRS § 377–9(f) to (h) provides:
(f) Any person aggrieved by the decision or order of the board may obtain a review thereof as provided in chapter 91 by instituting proceedings in the circuit court of the judicial circuit in which the person or any party resides or transacts business, subject, however, to the general provisions of law for a change of the place of trial or the calling in of another judge. Where different parties in the same proceeding file petitions for review in two or more courts having proper jurisdiction, the jurisdiction of the judge first petitioned shall be exclusive and the other persons shall be transferred to the judge. The petition shall

state the grounds upon which a review is sought and copies thereof shall be served upon the other parties and the board. Service may be made by mailing such copies to the last known post office address of the parties concerned. When the proceedings are at issue, they may be brought on for hearing before the court upon the record by any party on ten days' written notice to the others. Upon the hearing, the court may confirm, modify, or set aside the decision or order of the board and enter an appropriate decree. No objection that has not been urged before the board shall be considered by the court unless the failure or neglect to urge the objection shall be excused because of extraordinary circumstances.
(g) In any proceedings for review of a decision or order of the board, the judge shall disregard any irregularity or error unless it is made to appear affirmatively that the complaining party was prejudiced thereby.
(h) Commencement of proceedings under subsection (f) of this section shall not stay enforcement of the board decisions or order; but the board, or the reviewing court may

HLRB has obviously not filed a decision or order in this case. Accordingly, HGEA's assertion is unpersuasive because the language that it relies on in HRS § 89–14 does not refer to original jurisdiction.

HGEA also points out that, (1) in *Yogi*, this court "addressed whether a legislative statute involving Chapter 89 violated a constitutional provision and the *Yogi* court did not decide that the constitutional issue was within the exclusive jurisdiction of the HLRB," and (2) the HLRB "itself has held that it lacks jurisdiction to decide constitutional questions." However, the issue in *Yogi* was whether a *legislative amendment* to HRS § 89–9(a) violated the plaintiffs' constitutional right to organize for the purpose of collective bargaining. *See* 101 Hawai'i at 47, 62 P.3d at 190. As such, the issue presented in *Yogi* differs from the issue presented here inasmuch as *Yogi* did not address whether a public employer's action either violates or satisfies a statute that defines the scope of negotiations. *See* HRS § 89–9. On the one hand, HGEA asserted in its first amended complaint that, *inter alia*, "[f]urloughs reduce employee hours and wages and affect terms and conditions of employment and, therefore, are a mandatory subject of collective bargaining negotiation protected by Article XIII, Section 2 of the Hawaii State Constitution and *as prescribed by HRS § 89–9(a)*." (Emphasis added.) On the other hand, Lingle asserted in her opposition to HGEA's motion for preliminary injunction that, *inter alia*, certain "management rights" in HRS § 89–9(d) gives her authority to order the furlough of "unionized workers" without regard to collective bargaining. In light of these arguments, the statutory issue here is quite unlike the issue presented in *Yogi* where a legislative amendment to HRS § 89–

9(a) was held to have violated the rights of public employees under article XIII, section 2 of the Hawai'i Constitution. *See* 101 Hawai'i at 54, 62 P.3d at 197. More specifically, unlike Lingle's reliance on HRS § 89–9(d) in this case, the issue presented in *Yogi* was whether the phrase "as provided by law" in article XIII, § 2 of the Hawai'i Constitution "grant[ed] the legislature unfettered discretion to infringe on the core principles of collective bargaining." *Id.* at 55, 62 P.3d at 198 (Nakayama, J., concurring). Moreover, original jurisdiction was not at issue in *Yogi*. Therefore, *Yogi* is inapposite because *Yogi* did not address (1) the jurisdiction issue that is presented in this case, and (2) whether a public employer's action either violates or satisfies HRS § 89–9(a) or (d), respectively.

■■■ With regard to HGEA's second point, we read HGEA's first amended complaint as raising the following *two* pertinent issues: (1) whether Lingle's furlough constitutes "a mandatory subject of collective bargaining negotiation protected by Article XIII, Section 2 of the Hawaii State Constitution[,]" and (2) whether the furlough constitutes "a mandatory subject of collective bargaining negotiation ... as prescribed by HRS § 89–9(a)." Although it appears that the HLRB lacks jurisdiction to consider the constitutional issue, pertinent statutes reveal that the HLRB has jurisdiction to "[r]esolve controversies under [HRS chapter 89.]" HRS § 89–5(i)(3); *see id.* § 89–5(a); *id.* § 89–5(i)(4); *see also* HRS § 89–1(b)(3). As such, a constitutional analysis is unnecessary for the HLRB to adjudicate the statutory issues that are presented in HGEA's first amended complaint. Instead, the HLRB's analysis may be guided by rules of statutory construction [16] or any other rule it may deem

---

order a stay upon such terms as it deems proper.

**16.** We point out that this court follows certain well-established rules of statutory construction that are in addition to those rules quoted *supra* in section II.B. Namely, it is well-established that,

[w]hen construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language of the statute itself. *And we must read statutory language in the context of the entire statute and*

*construe it in a manner consistent with its purpose.*
*Coon v. City & County of Honolulu*, 98 Hawai'i 233, 245, 47 P.3d 348, 360 (2002) (citation omitted) (emphasis added). Moreover, "the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *Gray v. Administrative Dir. of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (citation and internal quotation marks omitted). "[A] rational, sensible and practicable interpretation of [a statute] is preferred to one which is

to be appropriate. For this reason, HGEA's assertion is unpersuasive.[17]

In other words, if the HLRB determined that the furlough plan constituted a valid exercise of Lingle's management rights under HRS § 89–9(d), then the circuit court would have jurisdiction to determine whether the exercise of such a statutory management right violates article XIII, section 2. However, if the HLRB reached the contrary conclusion and determined that Lingle's actions were not authorized under HRS Chapter 89, then the circuit court would not need to reach the constitutional issue.

▇▇▇▇ Thus, the circuit court erred by reaching the constitutional issue without first giving the HLRB the opportunity to address the issues arising under HRS Chapter 89. As we noted in *City & County of Honolulu v. Sherman*, 110 Hawai'i 39, 56 n. 7, 129 P.3d 542, 559 n. 7 (2006), "[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (Citation omitted.) Moreover, requiring that statutory issues be submitted to the HLRB furthers the legislative policy, reflected in HRS § 89–14's grant of "exclusive original jurisdiction," of having the administrative agency with expertise in these matters decide them in the first instance.

Stated differently, that legislative purpose is frustrated if the HLRB's jurisdiction can be defeated by characterizing issues that fall within the scope of HRS Chapter 89 as constitutional claims and then addressing them directly to the circuit court.

Similar to HGEA's assertions, Intervenors assert that the HLRB's jurisdiction "is limited to resolving claims of prohibited practices under the labor relations statutes, not constitutional violations, so the HLRB could not have decided the constitutional claim." In support of their assertion, Intervenors rely on HRS § 89–14 by reading the statute in the following way: "HLRB has jurisdiction over controversies 'concerning prohibited practices . . . as provided in [HRS] section 377–9[.]' " (Brackets added.) Intervenors then rely on the following language in HRS § 377–9: "Any controversy concerning unfair labor practices may be submitted to the board. . . ."

Through their reading of these statutes, Intervenors apparently suggest that because alleged constitutional violations are not included among the "prohibited practices . . . as provided in [HRS] section 377–9," jurisdiction over the constitutional issue properly resided in the circuit court. Such was the reasoning and conclusion of the circuit court in this case.[18]

---

unreasonable or impracticable[.]" *Keliipuleole v. Wilson*, 85 Hawai'i 217, 221–22, 941 P.2d 300, 304–05 (1997) (brackets added and in original) (citation and internal quotation marks omitted).
It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute.
*Camara v. Agsalud*, 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984).

17. However, we point out that, although not presented, there may be certain circumstances where the circuit court may decide interim relief. For example, the circuit court can provide temporary relief in cases involving alleged prohibited practices upon application by the HLRB. *See infra* note 20 and discussion on page 209, 239 P.3d page at 13.

18. In detail, the circuit court concluded that the instant case was

properly before the [c]ourt for issuance of injunctive and declaratory relief, because the issue is whether [Lingle's] June 1, 2009 decision, and implementation of that decision through Executive Order 09–02 (June 24, 2009), are a violation of Article XIII, Section 2 of the Hawaii State Constitution, just as the issue in *Yogi* was whether a statute violated Article XIII, Section 2 of the Hawaii State Constitution.
(Emphasis in original, brackets added.) As such, the circuit court "reject[ed] [Lingle's] contention that this case must be presented to the [HLRB]" because "[t]he jurisdiction of the [HLRB] is limited." (Brackets added.) According to the court's interpretation of HRS § 89–14, " 'the board shall have exclusive original jurisdiction' only over '[a] controversy concerning *prohibited practices* . . . as provided in section 377–9.' " Section 377–9, HRS, provides, in turn, that '[a]ny controversy *involving unfair labor practices* may be submitted to the board.' None of the prohibited practices in Chapter 377 include *constitutional* violations." (Emphases, brackets, and ellipsis in original.) The circuit court also pointed out that "HRS § 89–13 addresses various prohib-

However, we cannot say that HRS § 89–14's reference to HRS § 377–9 indicates any intent to distinguish between either different types of prohibited practices, or a prohibited practice on the one hand and constitutional violations on the other hand. Instead, our reading of HRS § 89–14 indicates that its reference to HRS § 377–9 is made to merely point to a statute that illustrates in what "manner" and "effect" a "controversy concerning prohibited practices may be submitted to the [HLRB.]" *See* HRS § 89–14. Indeed, the portion of HRS § 89–14 that Intervenors are referring to provides, in its entirety: "Any controversy concerning prohibited practices *may be submitted to the board in the same manner and with the same effect* as provided in section 377–9 . . . ." (Emphasis added.)

Among HRS § 377–9's subsections that illustrate in what "manner" and "effect" a "controversy concerning prohibited practices may be submitted to the [HLRB]" is HRS § 377–9(b), which provides in part that "[a]ny party in interest may file with the board a written complaint, on a form provided by the board, charging any person with having engaged in any specific unfair labor practice." Therefore, Intervenors' assertion is unpersuasive because HRS § 89–14's reference to HRS § 377–9 does not make the alleged distinction, and instead merely points to a statute that illustrates in what "manner" and "effect" a "controversy concerning prohibited practices may be submitted to the [HLRB] . . . ."

HGEA also asserts that jurisdiction properly resided in the circuit court in this case because the courts, and not the HLRB, "may grant the preliminary injunctive relief sought by HGEA." According to HGEA, "[Lingle's] oral announcement of furloughs on June 1, 2009, and written executive order on June 24, 2009, to be implemented by July 1, 2010[sic], provided only a short time frame to act, thereby creating exigent circumstances." [19]

However, HGEA does not cite to any authority that supports its position that, essentially, "exigent circumstances" justified the circuit court in proceeding directly to the constitutional issues without first allowing the HLRB to rule on the statutory questions. Instead, HGEA admits that "HRS § 380–14(b) provides that the [HLRB] shall have the power to petition any circuit court for appropriate temporary relief or restraining order[.]" [20] (Brackets added.) Accordingly, viewing HRS § 380–14(b) in light of HRS § 89–14, we remain mindful that "[p]rudential rules of judicial self-governance properly limit the role of the courts in a democratic society[,]" and one such rule is that, "even in the absence of constitutional restrictions, [courts] must still weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, *especially where there may be an intrusion into areas committed to other branches of government.*" *In re Attorney's Fees of Mohr,* 97 Hawai'i 1, 9–10, 32 P.3d 647, 655–56 (2001) (emphasis in original, brackets added and in original, internal quotation marks and citation omitted); *see Ross v. Stouffer Hotel Co. (Hawai'i) Ltd.,* 76 Hawai'i 454, 467, 879 P.2d 1037, 1050 (1994) (Klein, J., concurring and dissenting) ("[T]he Court's function in the application and interpretation of . . . laws must be carefully limited to avoid encroaching on the power of [the legislature] to determine policies and make laws to carry them out." (Quoting *Boys Mkts., Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 256–57, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).) (Internal quotation marks omitted, brackets in original and added, and ellipsis added.)). The record in this case does not establish that recourse to the

---

ited practices that the HLRB is required to render factual findings concerning whether or not a prohibited practice occurred."

**19.** We note that Intervenors assert a similar position as HGEA.

**20.** HRS § 380–14(b) (1993) provides:
The board shall have power, upon the filing of a complaint as provided in section 377–9 to petition any circuit court of the State within

any circuit wherein the unfair labor practice in question is alleged to have occurred or wherein the person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon the person, and thereupon shall have jurisdiction to grant to the board such temporary relief or restraining order as it deems just and proper.

procedure set forth in HRS § 380–14(b) would be either futile or impractical, and it would be unwise for us to bring about a policy that effectively circumscribes HLRB's exclusive original jurisdiction over "[a]ny controversy concerning prohibited practices[,]" as mandated by the legislature in HRS § 89–14. As such, HGEA's assertion is unpersuasive on the present record.

In light of the foregoing, we hold that the HLRB had exclusive original jurisdiction over the statutory issues raised in HGEA's complaint, and the circuit court erred in addressing the constitutional issues without first giving the HLRB the opportunity to address the statutory questions.[21] *See* HRS § 89–14; HRS § 89–13(a); *Sherman*, 110 Hawai'i at 56 n. 7, 129 P.3d at 559 n. 7; *Garcia*, 90 Hawai'i at 440–41, 978 P.2d at 878–79; *see also, e.g.*, H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943. However, we point out that, once the HLRB reaches a decision on the issues presented, that decision is subject to appeal, or "judicial review," "in accordance with [HRS] section 377–9 and [HRS] chapter 91." HRS § 89–14(2) (brackets added).

## IV. CONCLUSION

Based upon the foregoing analysis, we vacate the circuit court's July 28, 2009 final judgment and findings of fact, conclusions of law, and order, and remand this case for further proceedings consistent with this opinion.[22]

**21.** In light of the foregoing disposition, resolution of Lingle's remaining points of error is unnecessary.

**22.** Whether upon remand the circuit court should either dismiss or stay this case pending the outcome of any proceedings before the HLRB has not been argued on appeal. As such, we decline to express any opinion on this issue.

**1.** The same issues are present in No. 30052, *Hawaii State Teachers Ass'n v. Lingle*, Civ. No. 09–1–1372 (*HSTA*), presently pending before this court. In *HSTA*, Intervenors–Appellees Hawai'i State Teachers Association (HSTA) and United Public Workers, AFSCME, Local 646, AFL–CIO (UPW) in the instant case [collectively, Intervenors] also challenged the Governor's furlough

Dissenting Opinion by ACOBA, J.

I respectfully dissent.

I would hold that (1) inasmuch as Plaintiff–Appellee Hawai'i Government Employees Association, AFSCME Local 152, AFL–CIO (HGEA) and Defendant–Appellant Linda Lingle, as Governor of the State of Hawai'i (the Governor), entered into a Supplemental Agreement on October 14, 2009, settling the furlough dispute, this case is moot because it no longer presents a live controversy, (2) the case does not meet the capable of repetition yet evading review exception to the mootness doctrine, (3) this case may meet the standard of the public importance exception to the mootness doctrine,[1] (4) contrary to the position of the majority, the Circuit Court of the First Circuit (the court) had jurisdiction with respect to whether furloughs violated the Hawai'i Constitution, (5) the Hawai'i Labor Relations Board (the HLRB) could not decide the issue of whether the furlough plan constituted a prohibited practice because the overarching constitutional issue must be decided by the court first, and (6) the court had jurisdiction to grant injunctive relief and the HLRB did not.

### I.

HGEA is the exclusive collective bargaining representative for collective bargaining units 2, 3, 4, 9, and 13, and, as such, HGEA entered into collective bargaining agreements with the State of Hawai'i and other public employers, for the period from July 1, 2007 to June 30, 2009. On February 20, 2009, pursuant to Hawai'i Revised Statutes (HRS) § 89–11(a) (Supp.2009),[2] HGEA and

plan under article XIII, section 2 of the Hawai'i Constitution and raised other issues. A final judgment in that case was entered by the first circuit court on September 10, 2009. This court may take judicial notice of related cases. *Roxas v. Marcos*, 89 Hawai'i 91, 111 n. 9, 969 P.2d 1209, 1229 n. 9 (1998). This court granted Intervenors' motion for leave to intervene in this case on November 2, 2009.

**2.** HRS § 89–11(a) states:

A public employer and an exclusive representative may enter, at any time, into a written agreement setting forth an alternate impasse procedure culminating in an arbitration decision pursuant to subsection (f), to be invoked in the event of an impasse over the terms of an

the public employers, including the State of Hawai'i, entered into a Memorandum of Agreement. Under the Memorandum of Agreement, the parties agreed to an "alternative impasse procedure for the successor collective agreements, effective July 1, 2009."

On June 1, 2009, the Governor publically announced a proposal to close the State's projected $729 million budget shortfall. The proposal included, among other things, an order that all executive branch employees under her direct control would be furloughed for three days each month from July 1, 2009, to June 30, 2011.

On June 16, 2009, HGEA filed its original complaint in the court. The original complaint requested a declaratory judgment that the Governor cannot unilaterally impose furloughs, and a preliminary and permanent injunction enjoining the Governor from such action. Among the allegations asserted, the original complaint included the following:

> 4. On June 1, 2009, the Governor announced that state employees will be furloughed for 3 days/24 hours each month, from July 1, 2009 to June 30, 2011, thereby unilaterally reducing employees' hours and cutting employees' wages approximately 13.8%.

> 5. The Governor cannot unilaterally impose furloughs and circumvent collective bargaining process. *Furloughs reduce employee hours and wages and affect terms and conditions of employment and, therefore, are a mandatory subject of collective bargaining negotiation protected by Article XIII, Section 2 of the Hawaii State Constitution* [3] and as prescribed by HRS § 89–9(a).[4] Any disputes over negotiable subjects, when properly presented, must be resolved in accordance with the impasse, mediation, and arbitration process prescribed by HRS § 89–11 and the Memorandum of Agreement dated February 20, 2009, between HGEA and the Employer. The Governor does not have the implied right to unilaterally impose furloughs pursuant to HRS § 89–9(d).[5]

---

initial or renewed agreement. The alternate impasse procedure shall specify whether the parties desire an arbitrator or arbitration panel, how the neutral arbitrator is to be selected or the name of the person whom the parties desire to be appointed as the neutral arbitrator, and other details regarding the issuance of an arbitration decision. When an impasse exists, the parties shall notify the [HLRB] if they have agreed on an alternate impasse procedure. The [HLRB] shall permit the parties to proceed with their procedure and assist at times and to the extent requested by the parties in their procedure. In the absence of an alternate impasse procedure, the [HLRB] shall assist in the resolution of the impasse at times and in the manner prescribed in subsection (d) or (e), as the case may be. If the parties subsequently agree on an alternate impasse procedure, the parties shall notify the [HLRB]. The [HLRB] shall immediately discontinue the procedures initiated pursuant to subsection (d) or (e) and permit the parties to proceed with their procedure.

3. Article XIII, section 2 of the Hawai'i Constitution provides that "[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law."

4. HRS § 89–9(a) (Supp.2009) provides:
 (a) The employer and the exclusive representative shall meet at reasonable times, including meetings sufficiently in advance of the February 1 impasse date under section 89–11, and shall negotiate in good faith with respect to wages, hours, the amounts of contributions by the State and respective counties to the Hawaii employer-union health benefits trust fund or a voluntary employees' beneficiary association trust to the extent allowed in subsection (e), and other terms and conditions of employment that are subject to collective bargaining and that are to be embodied in a written agreement as specified in section 89–10, but the obligation does not compel either party to agree to a proposal or make a concession; provided that the parties may not negotiate with respect to cost items as defined by section 89–2 for the biennium 1999 to 2001, and the cost items of employees in bargaining units under section 89–6 in effect on June 30, 1999, shall remain in effect until July 1, 2001.

5. In relevant part, HRS 89–9(d) (Supp.2009) lists the subjects excluded from negotiations as follows:
 (d) Excluded from the subjects of negotiations are matters of classification, reclassification, benefits of but not contributions to the Hawaii employer-union health benefits trust fund or a voluntary employees' beneficiary association trust; recruitment; examination; initial pricing; and retirement benefits except as provided in section 88–8(h). *The employer and the exclusive representative shall not agree to any proposal* that would be inconsistent with the merit principle or the principle of equal pay for equal work pursuant to section 76–1 or

. . . .

7. Alternatively, even if furloughs are not a mandatory subject of collective bargaining, and they are, the *procedures for implementing furloughs are subject to negotiation under Article XIII, Section 2 of the Hawaii State Constitution* and HRS Chapter 89 and are also, if properly presented, subject to the above-described arbitration process.

### COUNT I

8. HGEA requests, and is entitled to receive, a declaratory judgment that the Governor cannot unilaterally impose the furloughs.

### COUNT II

9. HGEA requests, and is entitled to receive in order to avoid irreparable harm, a preliminary and permanent injunction from this court enjoining the Governor from unilaterally imposing the furloughs.

### COUNT III

10. Article XIII, Section 2 of the Hawaii State Constitution, in pertinent part, provides that:

[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining as prescribed by law.

11. *Chapter 89 of the [HRS] sets forth the public polices underlying collective bargaining in the public sector.*

12. *Chapter 89, Section 2 defines "collective bargaining" as:*

"Collective bargaining" means the performance of the mutual obligations of the public employer and the exclusive

representative *to* meet at reasonable times to confer and *negotiate in good faith,* and to execute a written agreement *with respect to wages, hours,* amounts of contributions by the State and counties to the Hawaii public employees health fund, *and other terms and conditions of employment,* except that by any such obligation neither party shall be compelled to agree to a proposal, or be required to make a concession. (Emphasis added). HRS § 89–2 [ (Supp.2009) ].

13. *The Governor's unilateral action is a violation of the Hawaii Constitution, Article XIII, Section 2.*

(Emphases added.)

On June 22, 2009, HGEA amended its original complaint. The first amended complaint (complaint) included all of the allegations pleaded in the original complaint and added an extra count regarding allegations that the Governor planned to "unilaterally implement new procedures regarding layoffs after June 30, 2009 and impose mass state employee layoffs" "if her furlough plan is blocked by the courts." Count IV alleged that layoff procedures were "subject to negotiation under Article XIII, Section 2 of the Hawaii State Constitution and HRS Chapter 89" and sought a declaratory judgment that the Governor could not "unilaterally impose new layoff procedures" and a preliminary and permanent injunction against the Governor from unilaterally imposing such procedures.

On June 23, 2009, HGEA filed a motion for preliminary injunction pursuant to HRS § 603–21.9 (Supp.2009) [6] and Hawai'i Rules

(Emphases added.)

that would interfere with the rights and obligations of a public employer to:
. . . .
(5) Relieve an employee from duties because of lack of work or other legitimate reason;
(6) Maintain efficiency and productivity, including maximizing the use of advanced technology, in government operations;
(7) Determine methods, means, and personnel by which the employer's operations are to be conducted; and
(8) Take such actions as may be necessary to carry out the missions of the employer in cases of emergencies.

6. In part, HRS § 603–21.9 states:
The several circuit courts shall have power:
(1) To make and issue all orders and writs necessary or appropriate in aid of their original or appellate jurisdiction;
. . . .
(6) To make and award such judgments, decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to

of Civil Procedure Rule 65. The injunction asked the court to enjoin the Governor from enforcing her announced plan to furlough state employees for three days each month, from July 1, 2009 to June 30, 2011, and from "unilaterally implementing new layoff procedures inconsistent with the existing collective bargaining agreements."

On June 24, 2009, the Governor issued Executive Order 09–02 (E.O.) implementing the proposed furlough plan.[7] The E.O. prescribed a furlough for certain State executive branch employees of seventy-two days over the fiscal biennium 2009–2011. According to the E.O., "furlough" was defined as "the placement of an employee temporarily and involuntarily in a non-pay and non-duty status by the Employer because of lack of work or funds, or other don-disciplinary reasons."

On June 29, 2009, the Governor filed a memorandum in opposition to HGEA's motion for preliminary injunction.

On July 2, 2009, the court held a hearing on HGEA's motion for preliminary injunction. At the hearing the court orally granted the motion, ruling that the furlough must be negotiated under article XIII, section 2 of the Hawai'i Constitution.

On July 28, 2009, the court issued its written findings of fact (findings), conclusions of law (conclusions), and order, which granted HGEA's motion for preliminary injunction as to Counts I, II, and III, and entered permanent injunctive relief against the Governor as to these counts and dismissed Count IV without prejudice. In sum, the court's decision concluded that (1) pursuant to *United Public Workers, AFSCME, Local 646, AFL–CIO v. Yogi*, 101 Hawai'i 46, 62 P.3d 189 (2002), and *Malahoff v. Saito*, 111 Hawai'i 168, 140 P.3d 401 (2006), the Governor's unilateral decision to furlough certain unionized state executive branch employees, which decreased actual wages by approximately fourteen to sixteen percent, infringed upon the public employees' right to "organize for the purposes of collective bargaining" in violation of article XIII, section 2 of the Hawai'i Constitution; (2) pursuant to *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the ordered furloughs violated the unilateral change doctrine because the furloughs altered wages, which were mandatory subjects of bargaining; (3) the Governor's argument that HLRB has original exclusive jurisdiction was not persuasive inasmuch as "the case [was] properly before the [court] … because the issue is whether the Governor's June 1, 2009 decision, and implementation of the decision through [the E.O.], are in violation of Article XIII, Section 2 of the Hawai'i State Constitution"; (4) *United Public Workers, AFSCME, Local 646, AFL–CIO v. Hanneman*, 106 Hawai'i 359, 105 P.3d 236 (2005), was inapposite; (5) the Governor's reliance on HRS § 89–9(d) to justify the unilateral imposition of the furlough plan cannot be accepted because it would allow lawmakers absolute discretion to define the scope of collective bargaining; and (6) the issues involving the layoff procedures were not ripe for consideration. On that same day, the court filed its final judgment in favor of HGEA and against the Governor as to Counts I, II and III.

On July 31, 2009, the Governor filed a notice of appeal. On September 1, 2009, the Governor filed an application to transfer her appeal from the Intermediate Court of Appeals to this court, and on September 22, 2009, this court granted the Governor's application for transfer.

However, on October 14, 2009, the State of Hawai'i and the HGEA entered into a Supplemental Agreement. The Supplemental

---

them by law or for the promotion of justice in matters pending before them.

7. The E.O. observed that "based on the May 28, 2009 projections by the Council on Revenues, the State of Hawai'i is now facing an additional deficit of seven hundred thirty million dollars ($730,000,000) through the fiscal biennium 2009–2011, resulting in an immediate fiscal emergency of unparalleled magnitude"; "the furlough of State employees, whose salaries and fringe benefits account for approximately seventy percent (70%) of the State operating budget, is necessary to balance the State budget"; the "furloughs will enable the State to minimize public service disruptions, postpone or avert mass employee layoffs, and result in minimal recruitment and training costs when the economy recovers"; and "if furloughs are not implemented, the State would need to layoff [sic] thousands of employees in order to realize an amount of expenditure reduction equivalent to the projected savings from a furlough[.]"

Agreement stated that both parties "have mutually agreed to a Memorandum of Agreement where Employees will be placed on furloughs for the contract period July 1, 2009, through June 30, 2011." The Supplemental Agreement also stated:

2. Entering into this [Supplemental Agreement], including the reference to the attached Furlough Plan, and entering into the above-referenced Memorandum of Agreement regarding furloughs, does not constitute a waiver of, and *shall not be interpreted or construed as any waiver of, any of the HGEA or Employer's positions or contentions asserted by either in HGEA v. Lingle, Civil no. 09–1–1375–06 KKS, Circuit Court* of the First Circuit, State of Hawai'i, or UPW and *HSTA v. Lingle, et al.,* Civil No. 09–1–1372–06 KKS, Circuit Court of the First Circuit, State of Hawai'i, including such positions or contentions asserted on appeal in those cases.

(Emphasis added.) On October 19, 2009, HGEA members ratified this Supplemental Agreement regarding the furloughs.

## II.

### A.

As noted by the parties, the Supplemental Agreement, ratified by the HGEA members on October 19, 2009, extends over the same two-year period covered by the furlough plan set forth in the E.O. This court has stated:

A case is moot if it has *lost its character as a present, live controversy* of the kind that must exist if courts are to avoid advisory opinions on abstract propositions of law. The rule is one of the prudential rules of judicial self-governance founded in concern about the proper—and properly limited—role of the courts in a democratic society. *We have said the suit must remain alive throughout the course of litigation to the moment of final appellate disposition to escape the mootness bar.*

*Kemp v. State of Hawai'i Child Support Enforcement Agency,* 111 Hawai'i 367, 385, 141 P.3d 1014, 1032 (2006) (quoting *Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw.

81, 87, 734 P.2d 161, 165 (1987) (internal citations, quotation marks, and brackets omitted)) (emphases added). Consequently, the instant case no longer presents this court with a live controversy. The fact that the parties have come to an agreement on furloughs has resolved the case. Thus, any ruling issued by this court on whether the furlough plan iterated in the Governor's E.O. can be implemented, will not affect the immediate rights and interests of the parties, inasmuch as the parties have already resolved them through the Supplemental Agreement. *See Wong v. Bd. of Regents, Univ. of Hawaii,* 62 Haw. 391, 394–95, 616 P.2d 201, 204 (1980) (stating that this court is only "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it") (citations omitted). Obviously then, the litigation between HGEA and the Governor is settled and the furlough controversy is moot.

However, the Governor argues that "the [S]upplemental [A]greement between HGEA and the State regarding the furloughs *specifically preserves* the parties' positions on appeal in *HGEA v. Lingle* [,]" (emphasis in original), because the Supplemental Agreement states that it "does not constitute a waiver of, and shall not be interpreted or construed as any waiver of, any of the HGEA or Employer's positions or contentions asserted ... in *HGEA v. Lingle* ..., including any such positions or contentions asserted on appeal[.]" Although the parties may have included this waiver provision, the agreement cannot confer jurisdiction on this court. *See Wong v. Wong,* 79 Hawai'i 26, 30, 897 P.2d 953, 957 (1995) (stating that "parties could not confer jurisdiction upon the court by agreement" (citing *O'Daniel v. Inter–Island Resorts, Ltd.,* 46 Haw. 197, 209, 377 P.2d 609, 615 (1962))); *Richards v. Ontai,* 20 Haw. 198, 202 (Haw.Terr.1910) (holding that "mere consent of parties cannot confer jurisdiction over the subject matter where none is given by law"); *Gilmartin v. Abastillas,* 10 Haw.App. 283, 292, 869 P.2d 1346, 1350 (1994) (stating that "[i]t is well-settled that subject-matter jurisdiction cannot be conferred upon a court

by agreement, stipulation, or consent of the parties") (internal citations omitted). Thus, even though the parties may have agreed that the agreement did not waive the issue raised in the complaint, that agreement has no effect on this court's jurisdiction or on the applicability of the mootness doctrine.

This court will not consider issues before it that have become moot:

> The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.

*Tauese v. State, Dep't of Labor & Indus. Relations,* 113 Hawai'i 1, 16 n. 8, 147 P.3d 785, 800 n. 8 (2006) (quoting *Wong v. Bd. of Regents,* 62 Haw. at 394–95, 616 P.2d at 204). In this case, even if this court were to reverse the court, the result is that the Governor's three-day-a-month furlough plan cannot be implemented inasmuch as it has been superceded by the October 14, 2009 agreement between the parties. Accordingly, inasmuch as this case no longer presents this court with a live controversy, this appeal is moot.

#### B.

In addition to no longer being a live controversy, this case does not present issues that meet the exception of being "capable of repetition yet evading review." Such a controversy is one in which "a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit." *Wong v. Bd. of Regents,* 62 Haw. at 396, 616 P.2d at 204 (quoting *Life of the Land v. Burns,* 59 Haw. 244, 251, 580 P.2d 405, 409–10 (1978)). In the instant case, although the parties

reached an agreement prior to the issue reaching this court for adjudication, it cannot be said reasonably that such an action will always evade review.

The E.O. was originally intended to cover a two-year time frame for the 2009–2011 fiscal biennium. That the parties reached an agreement within a few months does not demonstrate a likelihood that the propriety of a similar Executive Order would "evade full review because of the passage of time." *Id.* (quoting *Life of the Land,* 59 Haw. at 251, 580 P.2d at 410). Indeed, the foregoing demonstrates that this is not a case where "the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit." *Life of the Land,* 59 Haw. at 251, 580 P.2d at 410. Thus, this case does not fall within the "capable of repetition yet evading review" exception to the mootness doctrine.

#### C.

However, the instant case may satisfy the public-interest exception to the mootness doctrine. The public-interest exception to the mootness doctrine arises "when the question involved affects the public interest and an authoritative determination is desirable for the guidance of public officials[.]" *Kaho'ohanohano v. State,* 114 Hawai'i 302, 323, 162 P.3d 696, 727 (2007) (quoting *Slupecki v. Admin. Dir. of Courts, State of Hawai'i,* 110 Hawai'i 407, 409 n. 4, 133 P.3d 1199, 1201 n. 4 (2006) (citations omitted)). In applying this exception, this court must consider "(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for the future guidance of public officers, and (3) the likelihood of future recurrence of the question." *Id.* (quoting *Yogi,* 101 Hawai'i at 58, 62 P.3d at 201 (Acoba, J., concurring)) (internal quotation marks and brackets omitted).[8]

---

8. First, it is undisputed that the underlying controversy is of a public nature. The furlough decision impacting executive branch employees is clearly of a public nature where HGEA is the exclusive bargaining representative for collective bargaining units 2, 3, 4, 9, and 13, which includes state employees. *See Yogi,* 101 Hawai'i at

61, 62 P.3d at 204 (Acoba, J., concurring) (determining that the dispute was of a public nature because a public interest is undoubtedly involved where "four unions represent[ ] 48,000 workers" and "good faith bargaining and negotiation is fundamental ... to promote harmonious and cooperative relations between government and its

## III.

However, the majority rests its decision on the determination that the court did not have jurisdiction because the HLRB has "exclusive original jurisdiction over the statutory claims raised" in this case. Majority opinion at 206–07, 239 P.3d at 10–11. I must respectfully disagree that a prior decision by the HLRB was necessary in order for the court to obtain jurisdiction over this case inasmuch as (1) the validity of the furlough plan rests on whether its adoption violated the public employees' right to organize for the purpose of collective bargaining guaranteed by article XIII, section 2 of the Hawai'i Constitution, (2) all parties concede that the court had jurisdiction over this constitutional issue, (3) the constitutional issue cannot be resolved by the HLRB, and (4) the precedents of *Yogi* and *Malahoff* decided similar constitutional issues of whether the action of the legislature or executive branch infringed upon the constitutional collective bargaining rights of employees *without* requiring that the HLRB first decide those cases.

### A.

"[I]t is well settled that an appellate court is under an obligation to ensure that it has jurisdiction to hear and determine each case and to dismiss an appeal on its own motion where it concludes it lacks jurisdiction." *Ditto v. McCurdy*, 103 Hawai'i 153, 157, 80 P.3d 974, 978 (2003) (citing *Kernan v. Tanaka*, 75 Haw. 1, 15, 856 P.2d 1207, 1215 (1993), *cert. denied*, 510 U.S. 1119, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994)); *see also State v.*

*Moniz*, 69 Haw. 370, 372, 742 P.2d 373, 375 (1987) ("Although the matter of jurisdiction was not raised by the parties, appellate courts are under an obligation to insure that they have jurisdiction to hear and determine each case"); *Familian Northwest, Inc. v. Cent. Pac. Boiler & Piping, Ltd.*, 68 Haw. 368, 369, 714 P.2d 936, 937 (1986) ("When we perceive a jurisdictional defect in an appeal, we must, *sua sponte*, dismiss that appeal.") (Citations omitted.); *State v. Graybeard*, 93 Hawai'i 513, 516, 6 P.3d 385, 388 (App.2000) ("An appellate court has . . . an independent obligation to ensure jurisdiction over each case and to dismiss the appeal sua sponte if a jurisdictional defect exits." (Citing *Bacon v. Karlin*, 68 Haw. 648, 650, 727 P.2d 1127, 1129 (1986).)). Furthermore, it is well-established that the "lack of subject matter jurisdiction can never be waived by any party at any time." *Ditto*, 103 Hawai'i at 157, 80 P.3d at 978 (internal quotation marks and citation omitted); *Housing Fin. & Dev. Corp. v. Castle*, 79 Hawai'i 64, 76, 898 P.2d 576, 588 (1995) (internal quotation marks and citation omitted); *Chun v. Employees' Ret. Sys. of State of Hawaii*, 73 Haw. 9, 13, 828 P.2d 260, 263 (1992) (citing *In re Rice*, 68 Haw. 334, 713 P.2d 426 (1986)).

### B.

With respect to this issue, the Governor argues that the court lacked jurisdiction to rule on whether the furlough plan violated HRS chapter 89 because HRS § 89–14 (1993)[9] granted the HLRB "exclusive primary jurisdiction" over disputes involving

employees and to protect the public by assuring effective and orderly operations of government") (internal quotation marks and citation omitted). Second, "it is eminently desirable that authoritative guidance be established for the benefit of public officers" inasmuch as the executive branch regularly engages in bargaining with workers' unions and the HLRB is vested with the power to resolve labor disputes. *Id.* Third, it can be reasonably said that limitations on collective bargaining through the implementation of furloughs could potentially be raised whenever fiscal crises arise in state and county government. Thus, there is a likelihood of future recurrence of this question.

9. HRS § 89–14, entitled "Prevention of prohibited practices," states:

> *Any controversy concerning prohibited practices* may be submitted to the board in the same manner and with the same effect as provided in section 377–9; *provided that the board shall have exclusive original jurisdiction over such a controversy* except that nothing herein shall preclude (1) the institution of appropriate proceedings in circuit court pursuant to section 89–12(e) or (2) the judicial review of decisions or orders of the board in prohibited practice controversies in accordance with section 377–9 and chapter 91. All references in section 377–9 to "labor organization" shall include employee organization.
> (Emphases added.)

prohibited practices.[10] The Governor posits that controversies concerning prohibited practice referenced in HRS § 89–14 "include complaints that the employer has[ ](a) '[r]efused to bargain collectively in good faith[ ]'[;] (b) '[r]efused to participate in good faith in the mediation and arbitration procedures . . .'[;] (c) '[r]efused or failed to comply with any provision of chapter 89'[;] or (d) '[v]iolated the terms of a collective bargaining agreement.'" (Quoting HRS § 89–13(a)(5)–(8).) (Brackets omitted.) According to the Governor, HGEA's allegations regarding "whether the Governor had negotiated in good faith regarding the furloughs," and "whether [the Governor's] actions complied with [HRS] Chapter 89[,]" "fall neatly within this kind of dispute."

However, HGEA takes a contrary position. In its answering brief, HGEA states, "Governor's argument that the [HLRB] had exclusive original jurisdiction pursuant to HRS § [89]–14 is wrong because the courts, not the HLRB, can (1) decide constitutional issues and (2) grant injunctive relief." HGEA asserts that although the HLRB can decide prohibited practices and unfair labor practices, the statutes governing the HLRB do not empower HLRB to decide constitutional issues and the preliminary injunctive relief sought can only be granted by the courts and not the HLRB. Likewise, the Intervenors in their answering brief contend that "the jurisdiction of the [HLRB] is limited to resolving claims of prohibited practices under the labor relations statutes, not constitutional violations, so the HLRB could not have decided the constitutional claim."

### C.

As previously mentioned, *see supra* note 3, article XIII, section 2 of the Hawai'i Constitution grants persons in public employment "the right to organize for the purpose of collective bargaining as provided by law." This court has defined the phrase "collective bargaining as provided by law" as "the ability to engage in negotiations concerning *core subjects such as wages, hours, and other conditions of employment.*" *Yogi*, 101 Hawai'i at 53, 62 P.3d at 196 (emphasis added); *see also, Malahoff,* 111 Hawai'i at 188, 140 P.3d at 421 (recognizing that "implicit within article XIII, section 2 is the *right to collectively bargain over 'wages, hours, and other terms and conditions of employment'*" (citing HRS § 89–2; HRS § 89–3)) (emphasis added).

Count III of HGEA's complaint specifically alleged a constitutional "violation of article XIII, section 2." In support thereof, HGEA pled that "collective bargaining as provided by law" is defined, in relevant part, as "the performance of the mutual obligations of the public employer and the exclusive representative *to* meet at reasonable times to confer and *negotiate in good faith,* and to execute a written agreement *with respect to wages, hours, . . ., and other terms and conditions of employment* [.]" (Citing HRS § 89–2 (emphases in original)). HGEA alleged that the Governor's plan that "state employees will be furloughed for 3 days/24 hours each month, from July 1, 2009 to June 30, 2011," "circumvent[ed] the collective bargaining process" by "*unilaterally reducing employees' hours and cutting employees' wages approximately 13.8%* [.]" (Emphasis added.) Furthermore, HGEA claimed in its complaint that "the [f]urloughs *reduce[d] employee hours and wages and affect[ed] terms and conditions of employment* and, therefore, are a *mandatory subject of collective bargaining negotiation protected by Article XIII, Section 2* of the Hawai'i State Constitution and as prescribed by HRS § 89–9(a)." (Emphases added.)

---

**10.** HRS § 89–14 grants the HLRB exclusive original jurisdiction over controversies concerning prohibited practices, which is defined in HRS § 89–13. The parts of HRS § 89–13 (Supp.2009) that the Governor argues is relevant to this case are as follows:

> **Prohibited practices; evidence of bad faith.** (a) It shall be a prohibited practice for a public employer or its designated representative wilfully to:
> . . . .

> (5) Refuse to bargain collectively in good faith with the exclusive representative as required in section 89–9;
> (6) Refuse to participate in good faith in the mediation and arbitration procedures set forth in section 89–11;
> (7) Refuse or fail to comply with any provision of this chapter;
> (8) Violate the terms of a collective bargaining agreement[.]

Based on these allegations, HGEA's complaint manifestly challenged the Governor's furlough plan as violative of public employees' constitutional rights because the "[f]urloughs *reduce[d] employee hours and wages and affect[ed] terms and conditions of employment* " by "unilaterally reducing employees' hours and cutting employees' wages approximately 13.8%."

### D.

Indeed, all parties concede that the court had jurisdiction over the constitutional question of whether the furlough plan violated article XIII, section 2. As stated *supra*, HGEA argues that "the courts, not the HLRB, can (1) decide constitutional questions and (2) grant injunctive relief." Intervenors argue that "the jurisdiction of the [HLRB] is limited to resolving claims of prohibited practices . . ., so the HLRB could not have decided the constitutional claim." The Governor admits that *"[t]he Governor never contended that the [ ] court did not have jurisdiction over the constitutional question."* (Emphasis added.) According to the Governor, "the proper approach for the constitutional question would have been for the circuit court to (1) *assume* that the Governor's actions complied with chapter 89 (because only the HLRB can decide that question) and then (2) decide whether the furlough plan is constitutional exercise of HRS § 89-9(d) under Art. XIII § 2." (Emphasis added.) (Footnote omitted.)

### E.

Furthermore, it is not disputed that only the court, and not the HLRB, has jurisdiction over this constitutional question. In *HOH Corp. v. Motor Vehicle Industry Licensing Bd.*, 69 Haw. 135, 141, 736 P.2d 1271, 1275 (1987), this court held that "[a]lthough an administrative 'agency may always determine questions about its own jurisdiction [it] generally lacks power to pass upon constitutionality of a statute." Instead, "[t]he 'deli-

cate and difficult office [of ascertaining whether . . . legislation is in accordance with, or in contravention of, [constitutional] provisions' is confided to the courts." *Id.* at 142, 736 P.2d at 1275 (quoting *United States v. Butler*, 297 U.S. 1, 63, 56 S.Ct. 312, 80 L.Ed. 477 (1936)) (ellipsis and some brackets in original). Aside from the courts, "no other place is provided where [a] citizen may be heard to urge that the law [as written by the legislature] fails to conform to the [constitutional] limits set upon the use of [governmental] power." *Id.* (quoting *Butler*, 297 U.S. at 67, 56 S.Ct. 312).

### F.

Not surprisingly, then, this court has taken jurisdiction over alleged article XIII, section 2 violations without requiring that the parties first submit those claims as prohibited practices to the HLRB. *See Yogi*, 101 Hawai'i 46, 62 P.3d 189; *Malahoff*, 111 Hawai'i 168, 140 P.3d 401. In *Yogi*, this court decided whether HRS § 89-9(a) (Supp.2000),[11] which "in essence, . . . prohibited public employers and public employees' unions from collectively bargaining over cost items for the biennium 1999 to 2001[,]" violated the employees' right to organize for the purpose of collective bargaining under article XIII, section 2 of the Hawai'i Constitution. 101 Hawai'i at 48, 62 P.3d at 191. The term "cost items" was defined to include "*wages, hours,* amounts or contributions by the State and Counties to the Hawai'i public employees health fund, *and other terms and conditions of employment,* the implementation of which requires an appropriation by a legislative body." *Id.* (quoting HRS § 89-2 (1993)) (emphases added).

After confirming the established proposition that "[w]e review questions of constitutional law *de novo,* . . . exercising our own independent judgment based on the facts of the case[,]" *id.* at 49, 62 P.3d at 192 (citations omitted), this court in *Yogi* determined that "the framers of article XII[I], section 2 did

**11.** Act 100 of the 1999 legislative session amended HRS § 89-9(a) by adding the provision that "[the employer and the exclusive representative] may not negotiate with respect to cost items as defined by section 89-2 for the biennium 1999 to 2001, and the cost items of employees in bargaining units under section 89-6 in effect on June 30, 1999, shall remain in effect until July 1, 2001." *Yogi*, 101 Hawai'i at 49, 62 P.3d at 191.

not intend to grant our legislators complete and absolute discretion to determine the scope of 'collective bargaining[,]' " *id.* at 52, 62 P.3d at 195. Therefore, *Yogi* held that the legislature could not "take away the employees' right to organize for the purpose of collective bargaining." *Id.* at 54, 62 P.3d at 197. The term collective bargaining "entail[ed] the ability to engage in negotiations concerning core subjects such as wages, hours, and other conditions of employment." *Id.* at 53, 62 P.3d at 196. Consequently, this court held that a legislative amendment that prohibited the collective bargaining of cost items for two years "violate[d] the rights of public employees under article XIII, section 2 of the Hawai'i Constitution." *Id.* at 54, 62 P.3d at 197.

Like this case, the question in *Yogi* was whether employment terms affecting wages, hours, and other conditions should have been subjected to collective bargaining as required by the constitution. This court did not hold that the question of whether the prohibition against union employees negotiating cost items including wages, hours, and other conditions of employment was a prohibited practice within the exclusive and prior jurisdiction of the HLRB. Nor did this court hold that the failure to first obtain a ruling from the HLRB deprived the circuit court of jurisdiction. If the plaintiffs were required to have the HLRB decide the case before the circuit court had jurisdiction to decide the constitutional issue, this court would have

said so. As stated *supra*, this court is under the obligation to determine that jurisdiction exists in every case. *See Ditto*, 103 Hawai'i at 157, 80 P.3d at 978; *Moniz*, 69 Haw. at 373, 742 P.2d at 376; *Familian Northwest*, 68 Haw. at 369, 714 P.2d at 937; *Graybeard*, 93 Hawai'i at 516, 6 P.3d at 388. Thus, the majority's assertion that the HLRB was required to decide supposed issues of prohibited practice before the court exercised jurisdiction over an alleged infringement of article XIII, section 2 in this case is contrary to the precedent set forth in *Yogi*.

Similarly, this court in *Malahoff* did not require that the HLRB first decide the case in order for the circuit court to exercise jurisdiction. In *Malahoff*, the plaintiffs challenged the implementation by the Governor[12] and the Comptroller of the State of Hawai'i [collectively, the defendants] of a new "after-the-fact" payroll plan pursuant to HRS § 78–13 (Supp.2005).[13] 111 Hawai'i at 171, 140 P.3d at 404. That plan had the effect of delaying the dates on which certain public employees were paid. *Id.* The plaintiffs' amended complaint maintained that the defendants (1) "failed to publicly announce its intention to implement the payroll lag" as required by HRS § 78–13, (2) was "without authority to impose any payroll lag except in conformity with the specific timetable in HRS § 78–13[,]" (3) could "not implement a payroll lag because the one-time-once-a-month payroll provision would violate the

---

**12.** The governor in *Malahoff* was also Governor Lingle.

**13.** Act 355 of 1997 amended HRS § 78–13 to read as follows:

> **Salary Periods.** (a) Unless otherwise provided by law, all officers and employees shall be paid at least semimonthly except that substitute teachers, part-time hourly rated teachers of adult and evening classes, and other part-time, intermittent, or casual employees may be paid once a month and that the governor, upon reasonable notice and upon determination that the payroll payment basis should be converted from predicted payroll to after-the-fact payroll, may allow a one-time once a month payroll payment to all public officers and employees to effect a conversion to after-the-fact payroll as follows:
>
> (1) The implementation of the after-the-fact payroll will commence with the June 30,

> 1998, pay day, which will be delayed to July 1, 1998;
> (2) The July 15, 1998, pay day will be delayed to July 17, 1998;
> (3) The July 31, 1998, pay day will be delayed to August 3, 1998;
> (4) The August 14, 1998, pay day will be delayed to August 19, 1998;
> (5) The August 31, 1998, pay day will be delayed to September 4, 1998;
> (6) The September 15, 1998, pay day will be delayed to September 18, 1998; and
> (7) Thereafter, pay days will be on the fifth and the twentieth of every month. If the fifth and the twentieth fall on a state holiday, Saturday, or Sunday, the pay day will be the immediately preceding weekday.
>
> The implementation of the after-the-fact payroll shall not be subject to negotiation under chapter 89.

*Malahoff*, 111 Hawai'i at 174–75, 140 P.3d at 407–08 (emphases omitted).

semimonthly payroll requirement of HRS § 78–13[,]" and (4) "implementation of the payroll lag [was] contrary to the public employees' [constitutional] right to organize for the purpose of collective bargaining in violation of article XIII, section 2 of the Hawai'i Constitution[.]" *Id.* at 177, 140 P.3d at 410.

In the light of the appellees' allegations, the circuit court made the following findings:

1. Imposition of a payroll lag on UH faculty ... would deprive the faculty members of one paycheck in the month and year of implementation....

2. This loss of income would have a material and significant effect on the faculty, especially the lower-paid faculty.... A payroll lag would likely impose a substantial hardship on employees, who might not be able to meet their financial obligations, such as mortgage payments or court-ordered child support payments, in a timely manner.... A damage remedy would likely not address each employee's injury, as previously recognized by this court and the U.S. district court.

3. ... The Defendants have not shown that the payroll lag is both reasonable and necessary to fulfill an important public purpose.

*Id.* at 179–80, 140 P.3d at 412–13 (brackets omitted). The circuit court decided the case without requiring that the HLRB first decide these issues. The circuit court concluded *inter alia* that "[the d]efendants' imposition of a payroll lag on Plaintiff faculty would violate § 78–13(a), and would therefore be illegal[ ]" and, "thus, entered a permanent injunction against the [d]efendants.... Final judgment was entered on December 12, 2001." *Id.* at 180, 140 P.3d at 413. The circuit court entered its first amended judgment on June 7, 2002, which "[t]herein, the circuit court: (1) entered judgment in favor of the Plaintiffs with respect to ... violation of HRS § 78–13's breach of semimonthly payment requirement (Count III); [and] (2) dismissed all other claims[.]" *Id.*

On appeal, this court determined that the issues presented in *Malahoff* were "(1) *whether the Act 355 amendment to HRS*

§ *78–13(a) violate[d] article XIII, section 2 of the Hawai'i Constitution, ... and, if not,* (2) whether the circuit court properly concluded that the implementation of HRS § 78–13–after the specific dates set forth in the subject statute had passed-would violate the twice-monthly payment requirement of [HRS § ] 78–13(a)[.]" *Id.* at 181, 140 P.3d at 414 (emphasis added). *Malahoff* held that the legislative "amendment, which essentially alters the dates when public employees are to be paid, d[id] not violate article XIII, section 2 of the Hawai'i Constitution nor HRS chapter 89 inasmuch as [it did] not prohibit a state employer from changing the pay dates of its employees[,]" and, "[a]ccordingly, ... [the] amendment [wa]s not unconstitutional." *Id.* at 191, 140 P.3d at 424. *Thereafter*, this court determined whether HRS § 78–13(a) was violated when it was implemented after the specific dates set forth in that statute had passed.

*Malahoff* did *not* assume the validity of the challenged action before deciding the constitutionality of HRS § 78–13 with respect to article XIII, section 2. Instead, *Malahoff* decided the constitutional question *first,* before ruling on whether the State's implementation of the payroll lag violated the statute. As was apparent in *Malahoff* and should be here, the question of whether the payroll lag interfered with the employees' constitutional right to collective bargaining needed to be decided *before* considering whether the specific implementation of that plan violated the statute involved, HRS § 78–13. *Id.* at 181, 140 P.3d at 414. It was only *after* holding that the payroll plan was constitutional did this court in *Malahoff* consider whether the State's implementation of the payroll plan violated the statute.

Hence, *Malahoff* did not hold that the question of whether the implementation of the HRS § 78–13(a) payroll lag violated the constitution was within the exclusive original jurisdiction of the HLRB. Nor did this court hold that the failure to first obtain a ruling from the HLRB deprived the circuit court of jurisdiction over that case. If the appellees were required to have the HLRB decide the case before the circuit court exercised jurisdiction to decide the constitutional issues,

this court would have said so. As stated *supra*, this court is under the obligation to determine that jurisdiction exists in every case. *See Ditto*, 103 Hawai'i at 157, 80 P.3d at 978; *Moniz*, 69 Haw. at 373, 742 P.2d at 376; *Familian Northwest, Inc.*, 68 Haw. at 369, 714 P.2d at 937; *Graybeard*, 93 Hawai'i at 516, 6 P.3d at 388. Accordingly, the majority's assertion that the HLRB was required to decide the issues before the court had jurisdiction in this case is also contrary to the precedent set forth in *Malahoff*.

In sum, *Yogi* considered the constitutional issue of whether a statute prohibiting public employers and public employees' unions from bargaining over cost items violated the public employees' constitutional right to organize for the purpose of collective bargaining. *Malahoff* considered whether a plan to implement a payroll lag under HRS § 78–13 violated the same public employees' constitutional right to organize for collective bargaining. Likewise, this case rests on whether the furlough plan violates collective bargaining rights under article XIII, section 2. Neither *Yogi* nor *Malahoff* held that the authority to decide whether the legislative or executive branches violated article XIII, section 2, was within the exclusive original jurisdiction of HLRB. This court in *Yogi* and *Malahoff* exercised jurisdiction to decide the constitutional question of whether a statute or act violated article XIII, section 2 without first requiring the HLRB to decide any alleged prohibited practice issue. Thus, the court had, and this court has, jurisdiction over the constitutional question posed in Count III in this case. In deciding otherwise, the majority violates the precedents established by this court.

## IV.

### A.

As discussed *supra*, the Governor argues that the court lacked jurisdiction because HRS § 89–14 granted the HLRB "exclusive primary jurisdiction" over disputes involving prohibited practices. Contrary to the Governor's contentions, the legislature did not intend to grant "exclusive original jurisdiction"

to the HLRB in cases where the overarching issue is whether a supposed prohibited practice clashes with the constitution. The legislature amended HRS § 89–14 to include the "exclusive original jurisdiction" language in 1982. Prior to 1982, HRS § 89–14 read, in pertinent part, that "[a]ny controversy concerning prohibited practices may be submitted to the board in the same manner and with the same effect as provided in section 377–9." H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943. According to the legislative history, the legislature amended the statute to "legislatively rectif[y] or overrule[ ] the judicial conclusion or statutory construction enunciated in *Winslow v. State*[, 2 Haw.App. 50, 625 P.2d 1046 (1981) ]." H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943.

In *Winslow*, a state employee alleged that failure to grant her request for paid administrative leave and a transfer to another position violated the terms of her collective bargaining agreement. 2 Haw.App. at 53, 625 P.2d at 1049. The employee filed both a grievance in accordance with procedures set out in her collective bargaining agreement and a suit in circuit court against the State and the United Public Workers, Local 646 (Union). *Id.* at 53–54, 625 P.2d at 1050. The circuit court suit alleged essentially the same claims initially raised in the grievance and included allegations of negligence, infliction of emotional distress, and collusion between the State and Union. *Id.* at 54 n. 3, 625 P.2d at 1050 n. 3. One of the issues presented on appeal was "whether the Hawai'i Public Employment Relations Board (HPERB)[14] had exclusive original jurisdiction to hear complaints of unfair labor practices brought against a union by a union member[.]" *Id.* at 52, 625 P.2d at 1049. The ICA determined that while "HPERB is empowered to resolve disputes between employees and their unions[,]" HPERB's "jurisdiction in these matters ... is not exclusive." *Id.* at 56, 625 P.2d at 1051. Instead, where "the union is guilty of prohibited practices, the statutes permit such action to be brought before the [HPERB] or in a court of competent jurisdiction." *Id.* (footnote omitted).

**14.** HPERB became the HLRB in 1985. *See* 1985 Haw. Sess. Laws Act 251, § 4 at 476.

As the facts of that case indicated, the controversy in *Winslow* arose from the State's alleged failure to grant the request for paid administrative leave and transfer in violation of the collective bargaining agreement and the Union's wrongful refusal to process an employee's grievance. *Id.* at 53, 625 P.2d at 1049. Therefore, the case involved prohibited practices cognizable by the HPERB. The controversy in *Winslow* did not, however, include any alleged constitutional violation of the employee's right to collectively bargain under article XIII, section 2. Inasmuch as the legislature's reason for including the phrase "exclusive original jurisdiction" was to overrule *Winslow*, the legislature did not contemplate that the HLRB should have exclusive original jurisdiction over a prohibited practice controversy that hinged on the resolution of a constitutional question. In fact, there is no mention of constitutional issues anywhere in the 1982 legislative history. *See* H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943–44; H. Stand. Comm. Rep. No. 2339–82, in 1982 House Journal, at 1164; S. Stand. Comm. Rep. No. 597–82, in 1982 Senate Journal, at 1202. Thus, HRS § 89–14 does not evince any intent by the legislature to vest "exclusive original jurisdiction" in the HLRB when a constitutional question transcends an alleged prohibited practice, or to oust the circuit court from exercising jurisdiction over a case so situated. *Yogi* and *Malahoff* confirm this.

### B.

The Governor maintains that the court acted beyond its jurisdiction when it ruled on questions intended exclusively for the HLRB, and therefore, to the extent that the court "overreached its jurisdiction," the court's "[findings], [conclusions], and order, and judgment, must be vacated." According to the Governor, the questions intended ex-

clusively for the HLRB included 1) "decid[ing] that [*Hanneman*], 106 Hawai'i 359, 105 P.3d 236, ... did not apply," [15] and 2) "rul[ing] on the unilateral change doctrine." [16]

### 1.

Contrary to the Governor's first assertion, the court was correct in "reject[ing] the Governor's contention that this case [was] controlled by [*Hanneman*]." In *Hanneman*, refuse workers challenged the City's unilateral transfer of refuse workers from one location to another. The issues on appeal were whether the City's transfer was subject to collective bargaining under HRS § 89–9(a), and whether the transfer was excluded from collective bargaining under HRS § 89–9(d). *Hanneman* did not raise the question of whether the transfer policy violated the constitutional right of employees to collectively bargain. Instead, this court held that "the plain language of HRS § 89–9(d) was clear and unambiguous" in providing that specifically identified transfers were a "management right" and were therefore not a permissive subject of bargaining. Thus, *Hanneman* did not involve constitutional issues and is inapposite.

### 2.

Contrary to the Governor's second assertion, the unilateral change doctrine is subsumed in the constitutional question that can only be decided by the court. To reiterate, HGEA entered into collective bargaining agreements with the public employers, including the State of Hawai'i, for the period between July 1, 2007 to June 30, 2009. HGEA and the public employers, including the State of Hawai'i, entered into a Memorandum of Agreement dated February 20, 2009, adopting an alternative impasse procedure, which established a mediation and arbi-

---

**15.** Paragraphs 40 through 43 of the court's conclusions discussed the applicability of *Hanneman*. In its conclusions, the court rejected the Governor's contention that this case was controlled by *Hanneman* because the *Hanneman* court did not address any constitutional issue.

**16.** Paragraphs 21 through 23 of the court's conclusions discussed the application of the unilater-

al change doctrine. According to the court's conclusions, "under the unilateral change doctrine, the employer cannot implement unilateral changes regarding matters that are mandatory subjects of bargaining, and which are in fact under discussion." (Citing *Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230.)

tration timeline for achieving successor bargaining agreements for bargaining units 2, 3, 4, 9, and 13, effective July 1, 2009. Because the public employees' collective bargaining agreement was to expire on June 30, 2009, the parties had entered into the Memorandum of Agreement recognizing their impasse, and they planned to continue negotiations through mediation and arbitration procedures, HGEA contends that the "unilateral change" doctrine prevented the Governor from unilaterally imposing furloughs during the pendency of the mediation and arbitration process.

Under the "unilateral change" doctrine established in *Katz,* the United States Supreme Court held that after the expiration of a collective bargaining agreement, an employer cannot "institute changes regarding matters which are subjects of mandatory bargaining[,]" which are in fact under discussion in bona fide contract negotiations. 369 U.S. at 737, 82 S.Ct. 1107. The court here determined that section 8(a)(5) of the National Labor Relations Act in *Katz*[17] was similar to the standard provided by article XIII, section 2, and, thus, "an employer's unilateral change in conditions of employment under negotiations ... violates the duty to bargain collectively." The court therefore held that because the ordered furloughs reduced wages, the E.O. could not be imposed by unilateral action.

Whether the unilateral change doctrine applied in this case, however, rested on the answer to the constitutional question. If the Governor's furlough plan is unconstitutional, the application of the unilateral change doctrine would be unnecessary inasmuch as the implementation of the furlough plan after June 30, 2009, could not take place. If the Governor's furlough plan is constitutional, the unilateral change doctrine would not apply inasmuch as it would have been determined that after June 30, 2009, furloughs were not a subject of mandatory bargaining. Whether the unilateral change doctrine applies or not, it is subsumed in the constitu-

tional question raised by HGEA, and over which the court properly had jurisdiction.

### V.

Finally, requiring HGEA to seek a determination from the HLRB on whether the Governor's actions were a prohibited practice before it could seek injunctive relief from the court would result in an unjustifiable delay, burdening injunctive remedies. On June 1, 2009, the Governor announced her proposal to furlough certain state executive branch employees beginning July 1, 2009. This announcement gave HGEA and Intervenors one month to act before furloughs of certain state executive branch employees would be effective. Thus, the parties only had a brief time to seek an injunction before furloughs were instituted.

It is well established that "an injunction is an equitable remedy designed to protect property or other rights from irreparable injury by prohibiting or commanding certain acts." *Morgan v. Planning Dep't, County of Kauai,* 104 Hawai'i 173, 188, 86 P.3d 982, 997 (2004). Had HGEA and Intervenors sought injunctive relief before the HLRB on the ground that the furlough plan violated the constitution, there was no adequate mechanism to provide prompt relief. All parties concede that the HLRB did not have authority to grant injunctive relief in this case. Specifically, HRS § 380–14(b) (1993) provides in part that the HLRB only "shall have the power, upon the filing of a complaint ... to *petition* any circuit court of the State within any circuit wherein the unfair labor practice in question is alleged to have occurred ..., for appropriate temporary relief or restraining order." (Emphasis added.)

Thus, the HLRB itself is without the power to grant injunctive relief. In light of the time remaining before the commencement of the furloughs, it would have been unlikely that the entire administrative process at the HLRB followed by judicial review by the court could have been completed before the furlough plan took effect. Given that the HLRB could not have granted the injunctive

---

**17.** The National Labor Relations Act section 8(a)(5) states, "It shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(5).

relief sought, HGEA properly sought injunctive relief from the court, the only entity that could have granted it in conjunction with the constitutional question.

## VI.

The majority asserts that (1) HGEA alleged that Lingle engaged in a "prohibited practice" when she unilaterally imposed furloughs, majority opinion at 205, 239 P.3d at 9, (2) the HLRB had "exclusive original jurisdiction over the statutory claims raised in HGEA's complaint[,]" *id.* at 205, 239 P.3d at 9, (3) *Yogi* was inapposite because original jurisdiction and whether a public employer violated HRS § 89–8(a) or (d) were not issues in that case, *id.* at 207, 239 P.3d at 11, (4) a constitutional analysis was unnecessary for the HLRB to adjudicate the statutory issues that are presented in HGEA's amended complaint, *id.* at 207–08, 239 P.3d at 11–12, and (5) the court "erred by reaching the constitutional issue without first giving the HLRB the opportunity to address the issues arising under HRS Chapter 89[,]"[18] *id.* at 208, 239 P.3d at 12. For the reasons following I respectfully believe these statements are wrong.

## A.

With regard to the first contention, the majority concludes that "[v]iewing the assertions made by HGEA in its first amended complaint *in light of HRS § 89–13(a),* it ap-

*pears* that HGEA alleges that [the Governor] essentially engaged in a 'prohibited practice' when she unilaterally imposed furloughs." Majority opinion at 205, 239 P.3d at 9 (emphases added). To support this position, the majority asserts that HGEA's complaint alleged a prohibited practice under HRS § 89–13(a)(5). But the majority concedes, as it must, that "HGEA's complaint does not expressly use the words 'prohibited practice[.]' " *Id.* at 206, 239 P.3d at 10. Thus, the majority misapprehends the complaint and promotes its view by "inferr[ing]" that the complaint "essentially alleges ... that [the Governor] '[r]efuse[d] to bargain collectively in good faith with the exclusive representative as required in [HRS] section 89–9[.]' " *Id.*

The majority is mistaken in categorizing HGEA's allegations as prohibited practice claims inasmuch as HGEA's complaint does not refer to HRS § 89–13(a)(5) or any of the prohibited practices under HRS § 89–13(a), but instead, expressly challenged only the constitutionality of the Governor's furlough plan as observed *supra.*[19] Manifestly, the complaint alleges a violation of constitutional rights inasmuch as HGEA asserts that the furlough plan affected mandatory subjects of collective bargaining protected by article XIII, section 2 of the Hawai'i constitution.

HGEA's reference to HRS chapter 89 in it arguments is in the context of discussing the scope of article XIII, section 2 similar to

---

18. In light of the foregoing analysis set forth *supra,* it is unnecessary to reach HGEA's argument that HRS § 89–12 states that "nothing herein shall preclude ... the judicial review of decisions or orders or the HLRB in accordance with [HRS] section 377–9" and HRS § 377–9(a) provides that "[a]ny controversy concerning unfair labor practices may be submitted to the [HLRB] ..., but nothing herein shall prevent the pursuit of relief in courts of competent jurisdiction." It is also unnecessary to reach Intervenors' argument that the HLRB did not have jurisdiction over constitutional issues when HRS § 89–12 provides that the HLRB has jurisdiction over controversies "concerning prohibited practices ... as provided by [HRS] section 377–9" and HRS § 377–9 does not include constitutional violations as prohibited practices under the labor relation statutes.

19. To reiterate, Paragraph 5 of HGEA's complaint, which the majority uses to "infer[]" an allegation of a prohibited practice, states:

5. The Governor cannot unilaterally impose furloughs and circumvent the collective bargaining process. Furloughs reduce employee hours and wages and affect terms and conditions of employment *and, therefore, are a mandatory subject of collective bargaining negotiation protected by Article XIII, Section 2 of the Hawai'i State Constitution* and as prescribed by HRS § 89–9(a). Any disputes over negotiable subjects, when properly presented, must be resolved in accordance with the impasse, mediation, and arbitration process prescribed by HRS § 89–11 and the Memorandum of Agreement, dated February 20, 2009, between HGEA and the Employer. *The Governor does not have the implied right to unilaterally impose furloughs pursuant to HRS § 89–9(d).*

(Emphases added.)

both *Yogi* and *Malahoff.* *See Malahoff,* 111 Hawai'i at 188, 140 P.3d at 421 (recognizing that "implicit within article XIII, section 2 is the right to collectively bargain over 'wages, hours, and other terms and conditions of employment'" as prescribed in HRS chapter 89); *Yogi,* 101 Hawai'i at 53, 62 P.3d at 196 (defining the constitutional right to collective bargaining as "the ability to engage in negotiations of core subjects such as wages, hours, and other conditions of employment"). HGEA argues that, if "an attempt to freeze wages for two years to meet a fiscal crisis was unconstitutional," as were the facts in *Yogi,* "then so also must an attempt to cut wages for two years to meet a fiscal crisis be unconstitutional." Thus, HGEA's challenge to the furlough manifestly rests on the Hawai'i Constitution's collective bargaining provision. To construe the HGEA's and Intervenors' arguments otherwise mischaracterizes their positions and clashes with this court's decisions in *Yogi* and *Malahoff.*[20] Therefore, the majority's interpretation of HGEA's reference to HRS § 89–9(a), majority opinion at 205–06, 207, 239 P.3d at 9–10, 11, is incorrect.

## B.

With regard to the second assertion, the majority contends, based on its characterization of HGEA's complaint as alleging "a 'prohibited practice[,]'" that "the HLRB ha[d] exclusive original jurisdiction over the statutory claims raised in HGEA's complaint[.]" Majority opinion at 205, 239 P.3d at 9.[21] Yet, the majority does not explain how the HLRB could have exclusive original jurisdiction over the constitutional question pled in HGEA's complaint. Indeed, the majority inconsistently states that "it appears that the HLRB lacks jurisdiction to consider the constitutional issue[.]" It would appear plain that the HLRB does not have jurisdiction over HGEA's complaint because it cannot have jurisdiction over the constitutional issue at all. *See HOH Corp.,* 69 Haw. at 142, 736 P.2d at 1275 (recognizing that an agency "lacks power to pass upon constitutionality of a statute") (quoting *Butler,* 297 U.S. at 63, 56 S.Ct. 312). As discussed *supra,* HGEA's complaint unequivocally pled a constitutional violation of article XIII, section 2. Again, in contradiction to its position, the majority acknowledges that an issue raised in HGEA's complaint is "whether [the Governor's] furlough constitutes 'a mandatory subject of collective bargaining negotiation protected by Article XIII, Section 2 of the Hawai'i State Constitution[.]'" Majority opinion at 207, 239 P.3d at 11. Given that HGEA's complaint plainly alleged that the E.O. was un-

20. The majority takes one statement in Intervenors' answering brief out of context in stating that the "[Intervenors] 'acknowldege[d]' ... 'that the HLRB might have concluded that [the Governor's E.O.] was a prohibited practice because it violated the statutory duty to bargain in HRS Chapter 89.'" Majority opinion at 206 n. 14, 239 P.3d at 10 n. 14. Instead, Intervenors' answering brief takes the position that the E.O. violated the public employees' constitutional right to collectively bargain, and the court did not err in deciding the constitutional issue regardless of the fact that the HLRB might have concluded that the E.O. was a prohibited practice because "the circumstances of [the] case, in which tens of thousands of State workers and their families faced imminent harm from a clear, statewide violation of their constitution," created "strong policy interests [that] weighed against avoidance of the constitutional issue." As, discussed *supra,* the constitutional question must be answered first, in light of this court's precedent.

21. The majority cites *Garcia v. Kaiser Foundation Hospitals,* 90 Hawai'i 425, 440–41, 978 P.2d 863, 878–879 (1999), for the proposition that "the

HLRB had exclusive original jurisdiction over the statutory issues raised in HGEA's complaint, and the circuit court erred in addressing the constitutional issue[.]" *Id.* at 210, 239 P.3d at 14. In *Garcia,* this court held that, as required by HRS chapter 671, the plaintiffs' medical tort claims against the defendants must be submitted to a medical claim conciliation panel (MCCP) prior to filing the complaint with the circuit court. HRS § 671–12(a) (1993) required in part that "any person or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the medical claim conciliation panel before a suit based on the claim may be commenced in any court of this State." *Garcia* is inapposite as it discusses the authority of the MCCP under HRS § 671–12(a), which is irrelevant to this case. *Garcia* did not involve the HLRB and did not involve a jurisdictional issue under HRS § 89–12. More importantly, unlike this case, there is nothing in *Garcia* indicating that the medical tort claims of plaintiffs were grounded in any constitutional right. Obviously, *Garcia* did not involve a constitutional right to collectively bargain under article XIII, section 2.

constitutional and the HLRB lacks any jurisdiction over constitutional matters, the HLRB could not have original exclusive jurisdiction over HGEA's complaint. Thus, it is evident that the HLRB is not the proper forum in which to resolve the constitutionality of the Governor's furlough plan.

### C.

With regard to its third assertion, the majority begins its analysis of *Yogi* with the proposition that the plaintiffs in *Yogi* challenged a legislative amendment and then asserts that "*Yogi* did not address whether a public employer's action either violates or satisfies a statute[.]" *Id.* at 207, 239 P.3d at 11. Again, in classifying the issue in the instant case as whether the Governor "violated or satisfied a statute[,]" the majority misconstrues HGEA's complaint. The overarching common issue in this case, as it was in *Yogi*, is whether the government infringed upon core principles of collective bargaining in violation of article XIII, section 2 of the Hawaii's Constitution. *See Yogi*, 101 Hawai'i at 47, 62 P.3d at 190.

Moreover, *Yogi* is directly related to HGEA's case. *Yogi* recognized that "when the people ratified article XII[I], section 2,[22] they understood the phrase to entail the ability to engage in negotiations concerning core subjects such as wages, hours, and other conditions of employment[,]" and thus held that a restriction on the public employer's and representative's ability to bargain over cost items violated article XIII, section 2 of the Hawai'i Constitution because "it withdr[ew] from the bargaining process these core subjects of bargaining that the voters contemplated." [23] 101 Hawai'i at 53, 62 P.3d at 196. The court determined that these core subjects were protected by article XIII, section 2, and that the phrase "as provided by law" in article XIII, section 2 did not afford the legislature absolute discretion to deny public employees the right to negotiate on these core subjects of bargaining. *Id.* *Yogi* did not indicate that the constitutional analysis would be different if the plaintiffs had instead challenged the public employer's enforcement of HRS § 89–9(a). Similarly here, HGEA indicates that the furlough plan "withdrew," *id.*, core subjects from the bargaining process when the Governor "unilaterally" "reduce[d] employee hours and wages and affect[ed] terms and conditions of employment" which "are a mandatory subject of collective bargaining negotiations protected by Article XIII, Section 2[.]" In light of *Yogi* and the record, the majority's analysis posits a distinction that is without a difference.

Furthermore, the majority's assertion that "original jurisdiction was not an issue in [*Yogi*,]" majority opinion at 207, 239 P.3d at 11, is disingenuous. Jurisdiction was not an issue because it obviously existed. As discussed *supra, Yogi* held that HRS § 89–9(a), as amended by the legislature, violated article XIII, section 2 because the statute "t[ook] away the [employees'] right[,]" 101 Hawai'i at 52, 62 P.3d at 195, "to engage in negotiations concerning core subjects such as wages," *id.* at 53, 62 P.3d at 196. In *Yogi*, the enforcement of HRS § 89–9 by a public employer as amended by Act 100, section 2, would have constituted a prohibited practice under HRS § 89–13. Nevertheless, this court reached the constitutional question presented in the case without holding that a prohibited practice was involved, that the issue first must be decided by the HLRB, and that the circuit court lacked jurisdiction. *Yogi* thus underscores this court's jurisdiction over the instant case, inasmuch as in *Yogi*, this court had to first insure that it had jurisdiction and obviously decided that it did.

### D.

In regard to the fourth assertion, the majority states that "a constitutional analysis is

---

22. Article XIII, section 2 was formerly numbered Art. XII, sec. 2. Article XII, section 2 was renumbered to article XIII, section 2 and the phrase "as prescribed by law" was replaced with "as provided by law" during the 1978 Constitutional Convention. *Yogi*, 101 Hawai'i at 47 n. 5, 62 P.3d at 190 n. 5 (citing *Proceedings of the Consti-* *tutional Convention of Hawaii of 1978*, at 743 (1980)).

23. In *Yogi*, "it [was] undisputed that wages and cost items [were] among the core subjects of collective bargaining." 101 Hawai'i at 56, 62 P.3d at 199.

unnecessary for the HLRB to adjudicate the statutory issues that are presented in HGEA's [complaint,]" majority opinion at 207–08, 239 P.3d at 11–12, because (a) the statutory interpretation of pertinent statutes reveal that the HLRB has jurisdiction to "resolve controversies under HRS chapter 89[,]" *id.* at 205, 239 P.3d at 9 (quoting HRS § 89–5(i)(3) (Supp.2005)) (brackets omitted) (citing HRS §§ 89–5(a); 89–5(i)(4); 89–1(b)(3)); and (b) "if the HLRB determined that the furlough plan constituted a valid exercise of [the Governor's] management rights," *id.* at 208, 239 P.3d at 12, only then would the court "have jurisdiction to determine whether the exercise of such . . . right violates article XIII, section 2[,]" *id.;* but if the plan was "not authorized under HRS Chapter 89, then the circuit court would not need to reach the constitutional issue[,]" *id.*

With respect to (a), by citing to HRS §§ 89–5(a), 89–5(i)(3), 89–5(i)(4), and 89–1(b)(3) to support its position, the majority creates arguments for the Governor that were not made in her briefs on appeal. Because these provisions were not cited by either party, the majority essentially advances its own position, unrelated to what was asserted on appeal. Moreover, these statutes do not explain how HLRB obtains jurisdiction over HGEA's complaint, when the complaint involves a controlling constitutional question. That the HLRB may have jurisdiction under the referenced statutes is irrelevant in determining whether the HLRB has jurisdiction to decide the constitutional claim.

With respect to (b), irrespective of how the HLRB would decide the statutory issues, its decision would be subject to the overriding constitutional question of whether the practice violated the public employees' collective bargaining rights. If the furlough plan violates article XIII, section 2, it does not matter whether the furlough plan is a prohibited practice under HRS § 89–13. For if the furlough plan is unconstitutional, then all other issues, including any prohibited practice claims, are subsumed in that determination, and, thus, the HLRB decision regarding prohibited practices, if rendered first, as the majority requires, majority opinion at 208, 239 P.3d at 12, would be superfluous.

If the HLRB determined that the Governor was acting within the Governor's management rights under HRS § 89–9(d),[24] then the furlough plan would not have been a prohibited practice. However, the HLRB could not address whether in its view the furlough plan, although a valid practice under HRS § 89–9, violated article XIII, Section 2 of the Hawaiʻi Constitution. In contrast, the court would have jurisdiction to address the constitutional issue and, in fact, would have to address that issue.

The HLRB's decision would be subject to the court's overriding determination of whether the furlough plan violated article XIII, section 2 regardless of how it decided the statutory matters. Hence, there was a supervening necessity for the court to decide the constitutional question in either case as was recognized in both *Yogi* and *Malahoff.*[25]

**24.** See *supra* note 5.

**25.** The majority asserts in a footnote that "there may be certain circumstances where the circuit court may decide interim relief" such as "provid[ing] temporary relief in cases involving alleged prohibited practices upon application by the HLRB." Majority opinion at 208 n. 17, 239 P.3d at 12 n. 17 (referring to HRS § 380–14). HRS § 380–14(b) (1993) provides, in part, that "the [HLRB] shall have power, upon the filing of a complaint . . . to petition any circuit court of the State within any circuit wherein the unfair labor practice in question is alleged to have occurred . . ., for appropriate temporary relief or restraining order." However, as stated above, HGEA's complaint sought injunctive relief based upon a constitutional violation and not an "alleged prohibited practice[]" as the majority asserts. *Id.* As in *Yogi* and *Malahoff* a prior HLRB proceeding was not required, and had HGEA and Intervenors sought injunctive relief before the HLRB on the ground that the furlough plan violated the constitution, the HLRB had no authority to decide that constitutional issue. *See HOH Corp.,* 69 Haw. at 141, 736 P.2d at 1275. Thus, directly seeking injunctive relief from the court on constitutional grounds was the appropriate course in this case. As stated *supra,* the majority's requirement that HGEA seek the HLRB's determination on a prohibited practice issue constitutes an unjustifiable delay in seeking injunctive relief, given the brief time HGEA and Intervenors had before the Governor's furlough plan took effect. *See supra* at page 223–24, 239 P.3d at page 27–28. Plainly, the instant case is not one in which the "certain circumstances"

228

Based on the positions of the parties in the instant case, a cloud of uncertainty would remain over any HLRB ruling in the absence of the court's determination of the constitutional issue on its merits. Thus, requiring the parties to submit the HGEA's complaint to the HLRB as advanced by the majority, compels a resolution of the matter before a tribunal that cannot decide it.

E.

With regard to the majority's fifth assertion, the majority maintains that (a) *City & County of Honolulu v. Sherman*, 110 Hawai'i 39, 56 n. 7, 129 P.3d 542, 559 n. 7 (2006) "requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them[,]" majority opinion at 208, 239 P.3d at 12 (citation omitted), (b) "requiring that statutory issues be submitted to the HLRB furthers the legislative policy ... of having the administrative agency with expertise in these matters decide them in the first instance[,]" *id.*, and (c) "the legislative purpose is frustrated if the HLRB's jurisdiction can be defeated by characterizing issues that fall within the scope of HRS Chapter 89 as constitutional claims and then addressing them directly to the circuit court[,]" *id.*

With respect to (a), the majority's reliance on *Sherman* is misplaced. In contrast to the instant case, *Sherman* was not a labor dispute involving collective bargaining. Instead, *Sherman* involved a condemnation proceeding initiated by the City and County of Honolulu (the City) on behalf of condominium lessees (lessees) against the land owner, First United Methodist Church (the Church), in order to convert the lessees' interest from leasehold to fee simple. *Sherman*, 110 Hawai'i at 43, 129 P.3d at 546. The Church attempted to block the City's condemnation proceedings, arguing, *inter alia*, that Congress's enactment of the Religious Land Use and Institutionalized Persons Act (RLUIPA) prevented the City from condemning its land and transferring ownership interest to lessees. *Id.* The lessees' counter argument impliedly challenged the constitutionality of Congress's enactment of RLUIPA. *Id.* at 56 n. 7, 129 P.3d at 559 n. 7.

apply. *See* Majority opinion at 208 n. 17, 239

As *Sherman* noted, although the Church raised RLUIPA as a bar to the City's condemnation, this court ultimately concluded that RLUIPA was inapplicable to the Church's claims, and, thus, it was unnecessary to address its constitutionality. *Sherman* stated that because "RLUIPA was unavailable as a defense in the present matter, we would refrain from addressing the question of RLUIPA's constitutionality." *Id.* Implicit in that statement is the proposition that, had RLUIPA been available as a defense in that matter, this court would have addressed the argument. In contrast, the constitutional issue in the instant case is central to this case. It arises directly from the complaint, and is not merely a defense to the claims against the Governor. Obviously, then, *Sherman* does not stand for the proposition that this court may avoid its obligation to address issues properly raised by the parties when the issues are dispositive of the case.

Furthermore, as discussed *supra*, the decisions in *Yogi* and *Malahoff* presage that this court will assert jurisdiction where the constitutional issue posed by the collective bargaining provision is preeminent. Thus, this court has implicitly rejected the majority's arguments here inasmuch as these same arguments would pertain to *Yogi* and *Malahoff*. This court in *Yogi* concluded that the prohibition against negotiating cost items violated article XIII, section 2 of the Hawai'i Constitution, without mandating a preliminary prohibited practice proceeding before the HLRB. *See Yogi*, 101 Hawai'i at 54, 62 P.3d at 197. Nor did this court hold that the failure to obtain a HLRB ruling deprived the circuit court of jurisdiction over that case.

Similarly, *Malahoff* supports the proposition that the overarching constitutional issue must be decided before the determination of any collateral or incidental statutory question. Indeed, this court decided the constitutional question of whether the payroll lag interfered with the employees' right to collective bargaining *first*, before ruling on whether the State's implementation of the payroll lag violated HRS § 78–13. 111 Hawai'i at

P.3d at 12 n. 17.

181, 140 P.3d at 414. It was only *after* holding that the payroll plan was constitutional did this court in *Malahoff* consider the statutory issue. Likewise, the determination of whether the Governor's furlough plan is constitutional is not only of primary, but of paramount importance, inasmuch as any supposed separate HLRB prohibited practice decision would *always* be subject and inferior to the resolution by the court and this court of the constitutional question.

In sum, *Yogi* and *Malahoff* are controlling precedent. Thus, contrary to the majority's contention, the court did not err in concluding that the instant case was properly before the court because, as the court stated, "the issue of whether [the Governor's] June 1, 2009 decision, and implementation ... through [the E.O.] ... are a violation of Article XIII, Section 2 of the Hawai'i Constitution, [was] *just [like] the issue in Yogi [which] was whether a statute violated Article XIII, Section 2 of the Hawai'i State Constitution.*" (Emphasis added.)

With respect to (b), as discussed *supra,* the amendment to HRS chapter 89, which addressed exclusive original jurisdiction over prohibited practices, was intended to overrule the ICA's decision in *Winslow.* However, *Winslow* did not implicate constitutional questions. Thus, by legislatively overruling *Winslow,* the legislature did not divest the courts of the power to address constitutional issues unless and until the statutory issues are decided by the HLRB. The majority's assertion that requiring the prohibited practice issue to be decided before the court has jurisdiction over constitutional issues "furthers the legislative policy," majority opinion at 208, 239 P.3d at 12, is clearly wrong inasmuch as there is no such legislative policy.

Furthermore, although "[o]rdinarily, deference will be given to decisions of administrative agencies acting within the realm of their expertise[,]" *Maha'ulepu v. Land Use*

*Comm'n,* 71 Haw. 332, 335, 790 P.2d 906, 908 (1990) (citation omitted), such deference does not extend to matters over which the agencies do not have jurisdiction. As discussed *supra,* the HLRB does not have any jurisdiction over constitutional questions. *HOH Corp.,* 69 Haw. at 141, 736 P.2d at 1275.

Finally, with regard to (c), the majority wrongly characterizes HGEA's claims as attempting to defeat the HLRB's jurisdiction by alleging constitutional claims. Majority opinion at 208, 239 P.3d at 12. Inasmuch as the constitutional issues are apparent from the face of the complaint, they are dispositive of the case. It would seem apparent that the determination of the constitutional issue could not "frustrate[ ]" the legislative purpose of HRS chapter 89, when HRS chapter 89 does not give the HLRB jurisdiction over constitutional questions. *Id.* The legislative purpose cannot be said to be "frustrated" when, as in *Yogi* and *Malahoff,* as discussed *supra,* this court asserted jurisdiction and decided the preeminent constitutional dispute arising out of an alleged prohibited practice.

## VII.

For the foregoing reasons, I believe that the court had jurisdiction over HGEA's complaint, but the case is moot inasmuch as this case no longer presents a live controversy. This case may meet the standard of the public importance exception to the mootness doctrine. Accordingly, and moreover, we have jurisdiction in this case, contrary to the majority's position. Therefore, I respectfully dissent.

